Gale M. LEVINE and Marina Shores, Ltd., Plaintiffs,

v.

F. Wayne McLESKEY, Jr., Defendant.

Civ. A. No. 2:94cv512.

United States District Court, E.D. Virginia, Norfolk Division.

March 10, 1995.

expenses. Compare Pl's Mot. for Fees at 15 with Pl's Mot. for Fees, Ex. R.

J. Gray Lawrence, Jr., Howell, Daugherty, Brown & Lawrence, Norfolk, VA, Wyatt B. Durrette, Jr., Durrette, Irvin, Lemons & Bradshaw, Richmond, VA, for plaintiffs.

Conrad Moss Shumadine, Walter Dekalb Kelley, Jr., Willcox & Savage, Norfolk, VA, for defendant.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

### I. INTRODUCTION

Plaintiffs Gale M. Levine (Levine) and Marina Shores, Ltd. (Marina Shores or the Marina) are suing defendant F. Wayne McLeskey (McLeskey), alleging antitrust and various state law injuries in a fifteen count complaint as follows: Count I (Levine's claim under § 1 of the Sherman Antitrust Act),

Count II (Marina Shores' claim under § 1 of the Sherman Antitrust Act), Count III (Marina Shores' claim under § 2 of the Sherman Antitrust Act), Count IV (Levine's claim under the Virginia antitrust laws), Count V (Marina Shores' claim under the Virginia antitrust laws), Count VI (defamation of Levine), Count VII (defamation of Marina Shores), Count VIII (slander of title of Levine's property), Count IX (malicious prosecution of Marina Shores), Count X (malicious prosecution of Levine), Count XI (intentional infliction of emotional distress on Levine), Count XII (tortious interference with Levine's contract and business expectancy), Count XIII (tortious interference with Marina Shore's contract and business expectancy), Count XIV (Levine's claim of conspiracy in violation of Va.Code § 18.2–500), and Count XV (Marina Shores' claim of conspiracy in violation of Va.Code § 18.2–500). Plaintiffs seek compensatory, treble and punitive damages totaling $224,800,000.00. McLeskey has filed four motions for summary judgement, which together seek dismissal of all counts of the complaint.

For the reasons that follow, the Court **GRANTS** summary judgment on all counts.[1]

## II. STANDARD OF REVIEW

Rule 56(c) provides that a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment is initially responsible for identifying those portions of the factual record which it believes establish that there are no genuine issues of material fact. Once the moving party has made this showing, the opposing party must demonstrate, by reference to affidavits, depositions, answers to interrogatories, or admis-

sions, that a triable issue of fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Furthermore, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). In order for Levine and Marina Shores to survive summary judgment, they must show that McLeskey's actions proximately caused their damages, and that their claim is "at least a reasonable probability rather than merely one of several equally surmisable possibilities." *Charleston Area Medical Center, Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.,* 6 F.3d 243, 247 (4th Cir.1993).

## III. FACTS

In 1978, F. Wayne McLeskey founded Lynnhaven Dry Storage Marina, Inc. ("Lynnhaven Marine"). Lynnhaven Marine is located on one of the main highways in Virginia Beach and for many years it was the principal dry storage marina in the surrounding area. In 1989, Levine and her husband, David, formed Marina Shores.[2] The following year, construction of the Marina at Marina Shores began.

Marina Shores was envisioned as a complex that would include dry boat storage, wet slips, stores, and a restaurant. Levine also planned to build an apartment complex and shopping centers on land nearby after construction of the marina was complete. Prob-

---

1. Even though the Court has granted summary judgment as to all federal antitrust claims, for the purposes of judicial economy the Court will exercise its discretion to address all pendent state claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

2. Gale Levine is President, Chief Operating Officer, and owner of Marina Shores. David Levine has assigned his litigation rights in this case to his wife and is not a party to this action.

lems with the restaurant and construction of the additional facilities laid the foundation for the current litigation.

While construction of the marina was underway, Levine reached an agreement with a Virginia Beach restaurateur named Norman Cohn to open and manage a restaurant at Marina Shores. Mr. Cohn subsequently formed a corporation called Cohn–Phillips, Ltd. to operate the restaurant, and named the restaurant "Hoppers II." The parties signed a fifteen-year lease on October 5, 1990. The basic terms of the lease stated that rent of at least $6,000 per month or 15% of the restaurant's gross receipts, whichever was greater, would be due on the first of every month.[3] This payment would cover the preceding month's tenancy. Levine also provided Cohn–Phillips with a credit line of approximately $95,000 to cover restaurant equipment and start-up costs. The terms of this credit line required repayment of the borrowed funds within two days of notice. If the money was not repaid upon two days notice Cohn–Phillips would lose its right to operate the restaurant. According to Levine, she informed Cohn that the money was to be repaid near the end of construction.

In April of 1991, the marina was completed and began competing with Lynnhaven Marine for dry storage customers. A few weeks later, Levine demanded that Cohn repay the money extended under the line of credit. Cohn did not have the funds available and eventually sold McLeskey 50% of Cohn–Phillips, Ltd. for approximately $90,000.[4] Cohn repaid Levine on May 9, 1991. Levine subsequently discovered that McLeskey was Cohn's partner. McLeskey and the Levines have had a longstanding dislike for each other that predates their current dispute.

On June 2, 1991, Levine's attorneys notified Cohn–Phillips that she was terminating the company's lease for failure to pay rent for the previous two months.[5] Cohn–Phillips

immediately attempted to pay the rent, but it was refused. Cohn–Phillips then refused to vacate the restaurant and a flurry of litigation between the parties ensued.

The first of these lawsuits was *Marina Shores, Ltd. v. Cohn–Phillips, Ltd.,* Law No. CL91–1780 [hereinafter the "Hoppers case"], which was brought on June 7, 1991. In this case, Marina Shores filed an unlawful detainer action against Cohn–Phillips seeking to regain possession of the restaurant premises and to recover damages allegedly caused by improper management. In response, Cohn–Phillips filed three counterclaims, arguing that Marina Shores had breached the lease, tortiously interfered with Cohn–Phillips' business expectancy, and conspired to injure the restaurant's business in violation of the Virginia conspiracy laws.[6] Before trial, the judge in the case granted partial summary judgment to Cohn–Phillips precluding litigation of whether Cohn–Phillips breached its lease by not making timely rent payments. The court found that since the lease had not been terminated properly under Virginia law, an action based on failure to pay rent was not maintainable. On April 1, 1992, after a lengthy trial, the jury in the Hoppers case returned a verdict in favor of Cohn–Phillips on both the claims raised by Marina Shores and the counterclaims made by Cohn–Phillips. The jury awarded Cohn–Phillips $43,000 in damages for breach of contract, $120,000 in compensatory damages and $480,000 in punitive damages for tortious interference, and $400,000 in compensatory damages for conspiracy. The conspiracy damages were then trebled pursuant to the relevant statute to $1.2 million. The trial judge entered final judgment on July 24, 1992, and, among other rulings, set aside the conspiracy verdict and reduced the punitive damages award to $350,000. Both parties appealed to the Virginia Supreme Court.

---

**3.** The lease included a provision increasing the base rent to $6,666.66 per month after August 30, 1991.

**4.** McLeskey also agreed to provide Cohn–Phillips with a line of credit up to $150,000 secured by a deed of trust on Norman Cohn's home.

**5.** McLeskey claims the rent was late because it was based on a percentage of net sales and substantial calculations had to be made in order to determine the amount of rent actually due.

**6.** See VA.CODE ANN. §§ 18.2–499 and 500 (Michie 1994). Plaintiffs allege that McLeskey violated these same laws in the instant suit.

Meanwhile, on May 15, 1992, Cohn–Phillips filed the lawsuit *Cohn–Phillips, Ltd. v. David I. Levine and Gale M. Levine,* Law No. CL92–1338 [hereinafter the "Alter Ego Litigation"]. In this action, Cohn–Phillips sought to pierce Marina Shores' corporate veil on the grounds that the business was undercapitalized and was merely a shell company formed in order to protect David and Gale Levine from liability. Shortly thereafter, Cohn–Phillips also filed a *lis pendens* on the 24–acres of unsubdivided land where the marina was located.

Later that month, Cohn–Phillips sought an injunction against Marina Shores claiming that Marina Shores continued to interfere with its operation of the restaurant. The case was styled *Cohn–Phillips, Ltd. v. Marina Shores, Ltd.,* Chancery No. CH92–1806 [hereinafter the "Conspiracy Act Litigation"]. Cohn–Phillips states that it filed this action in chancery court because the court considering the Hoppers case did not have power to grant equitable relief. This case is still pending.

On July 15, 1992, in Virginia Beach Circuit Court, Levine's attorney moved to have the *lis pendens* quashed, arguing that it prevented Marina Shores from restructuring its construction loan. Cohn–Phillips' attorney at the time was unable to attend. However, the court entered an *ex parte* order despite this fact, which quashed and released the trust. Levine's attorney objected to the entry of the *ex parte* order in writing and subsequently filed a second *lis pendens,* which was never served upon Levine or Marina Shores.[7] Meanwhile, another judge vacated the order quashing the *lis pendens* and rescheduled argument on the matter.[8]

In September of 1992, Marina Shores filed a second unlawful detainer action against Cohn–Phillips, styled *Marina Shores, Ltd. v. Cohn–Phillips, Ltd.,* Law No. CL92–2578 [hereinafter the "Rent Litigation"]. This suit was brought on the grounds that Cohn–Phillips failed to pay its rent for the months of June, July, August, and September of 1992.[9] Cohn–Phillips counterclaimed that Marina Shores had breached the restaurant's lease and tortiously interfered with the restaurant's operation. This case has been stayed pending the outcome of the instant litigation pursuant to a motion by Cohn–Phillips.

The Virginia Supreme Court issued its ruling in the Hoppers case on September 17, 1993.[10] In brief, the court found that Marina Shores had lawfully terminated the Hoppers II restaurant lease and reversed the lower court's judgment. Cohn–Phillips immediately requested a rehearing on the matter, which the Virginia Supreme Court denied.

While the Hoppers case was pending, Cohn–Phillips had paid approximately $100,000 in rent monies into an escrow account jointly administered by the parties' respective counsel. After the Supreme Court's verdict, Marina Shores demanded the funds but Cohn–Phillips refused to agree to release them. Cohn–Phillips claimed that Marina Shores was not entitled to the money because its harassment and tortious interference had rendered the use of the restaurant worthless. Marina Shores filed a detinue action to recover the money styled *Marina Shores, Ltd. v. Cohn–Phillips, Ltd., Carl Isbrandtsen (Escrow Agent) and Jerrold Weinberg (Escrow Agent),* Law No. CL93–3725. Cohn–Phillips demurred and filed the case *F. Wayne McLeskey, Jr. and Norman Cohn, Assignees of Cohn–Phillips. Ltd. v. Marina Shores. Ltd., Jerrold Weinberg (Escrow Agent) and Carl Isbrandtsen (Escrow*

---

**7.** This lis pendens was filed in conjunction with the lawsuit *Cohn–Phillips, Ltd. v. David I. Levine and Gale M. Levine,* Chancery No. CH92–2467. Defendant's counsel claims this action was filed because some of the counts contained in the identically styled law action "would be more properly considered on the equity side of court." (Isbrandtsen Aff. at ¶ 11, Ex. 13 in Vol. VI of Ex. in Supp. of Def.'s Mot. for Summ. J.)

**8.** Isbrandtsen later moved to dismiss the chancery suit and release the second *lis pendens.* The

reinstated first *lis pendens* was eventually quashed on November 30, 1992.

**9.** The parties had escrowed rent in a joint account through May 1992. After that month, Cohn–Phillips claimed an offset due to the jury's financial verdict in their favor. (Pls.' Br. in Resp. to Def.'s Mot. for Summ. J. at 166.)

**10.** *See Marina Shores, Ltd. v. Cohn–Phillips, Ltd.,* 246 Va. 222, 435 S.E.2d 136 (1993).

*Agent)*, Law No. CL93–3815 [hereinafter the "Escrow Litigation"], seeking a declaratory judgment of who was entitled to the funds. Marina Shores demurred to this lawsuit. The Virginia Beach Circuit Court granted Cohn–Phillips' demurrer, overruled Marina Shores' demurrer and dismissed the detinue action. Following a trial on the declaratory judgment action, the Virginia Beach Circuit Court found that Marina Shores was entitled to the escrowed funds. This judgment is on appeal. Meanwhile, the disputes between the parties culminated with the Levine and Marina Shores filing this action on May 19, 1994.

## IV. COLLATERAL ESTOPPEL AND SHAM LITIGATION

Two issues relevant to the plaintiffs' antitrust claims must be resolved at the outset of this case. The first is whether plaintiffs can relitigate the factual findings of the jury in the Hoppers case. The second is whether the lawsuits brought by the defendant constitute "sham" litigation. For the reasons below, the Court answers both of these questions in the negative, and plaintiffs cannot rely on facts arising from these matters in support of their claims.

### A. Collateral Estoppel.

■ A central component of plaintiffs' Sherman antitrust claims is that Cohn–Phillips operated "Hoppers in a manner calculated to and with the effect of severely damaging the business and property of Marina Shores ..." (Pls.' Compl., ¶¶ 41(b), 46(b), and 51(b).) The defendant argues that this issue was already decided by the jury in the Hoppers case and cannot be relitigated based upon the doctrine of collateral estoppel.

The Hoppers jury was asked the following question in Jury Instruction # 10:

1. Did the defendant, Cohn–Phillips, Ltd., default or breach the Restaurant Lease by any of the following:

a. Failing to use the subject premises as a restaurant, with, at the option of the defendant, entertainment and for no other purpose in violation of Paragraph 4(a) of the Restaurant Lease;

b. Failing to control the conduct of its invitees who continue to harass other occupants of the marina, and continuing the sale of alcoholic beverages to obviously intoxicated persons;

c. Failing to request the consent of Marina Shores, Ltd with respect to the outside room/food storage facilities or the exterior vent stack constructed by or on behalf of Cohn–Phillips, Ltd. and failing to remove same;

d. Failing and refusing to provide evidence of insurance coverages;

e. Failing to employ an adequate security force to ensure that its patrons vacate the building and public areas of the marina upon close of business daily, and otherwise failing to control the behavior and conduct of its patrons;

f. Failing to maintain restrooms in a clean and serviceable condition;

g. Failing in all respects to control the parking of its invitees on the Marina Shores complex;

h. Failing and refusing to clean the parking lot and public areas adjacent to the premises daily;

i. Failing and refusing to maintain adequate security to ensure that proper order was maintained by invitees of Cohn–Phillips, Ltd. and permitting regular occurrences of public drunkenness, urination in public, indecent exposure, fist fights, vandalism and verbal harassment of patrons of Marina Shores, Ltd., all committed by invitees of Cohn–Phillips, Ltd.

The jury answered "no" to each of these questions and the Court finds that these are the same alleged activities which plaintiffs seek to prove in the instant case.[11]

11. For example, plaintiffs claim that:

As the controlling shareholder of Cohn–Phillips, McLeskey encouraged the operation of Hoppers in a manner designed to interfere with the operations of Marina Shores....

McLeskey's unlawful actions had an anticompetitive effect. By destroying Marina Shore's business and it ability to borrow money, McLeskey prevented Marina Shores from providing all the amenities which Marina Shores was designed to offer, such as a com-

As the United States Supreme Court stated in *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984): "It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Id.* at 81, 104 S.Ct. at 896. The same principle was pronounced in *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), where the Court stated:

> The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."

*Id.* at 380, 105 S.Ct. at 1331–32. Therefore, the Court will examine Virginia's application of the doctrine of collateral estoppel.

In *Bates v. Devers,* 214 Va. 667, 202 S.E.2d 917 (1974), the Virginia Supreme Court succinctly stated the definition of collateral estoppel. The court said:

> Collateral estoppel is the preclusive effect impacting in a subsequent action based upon a collateral and *different cause of action.* In the subsequent action, the parties to the first action and their privies are precluded from litigating any *issue* of fact actually litigated and essential to a valid and final personal judgment in the first action.

*Id.* 202 S.E.2d at 921 (footnotes omitted). The Virginia Supreme Court went on to state that: "one asserting the defense of ... collateral estoppel must show by a preponderance of the evidence that the claim or issue should be precluded by the prior judgment." *Id.* at 921 (citations omitted). In addition, the Virginia Supreme Court has held that in order to apply the doctrine of collateral estoppel the following conditions must be met:

> (1) the parties to the two proceedings must be the same. (2) the issue of fact sought to be litigated must have been actually litigated in the prior proceeding, (3) the issue of fact must have been essential to the prior judgment, and (4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to be applied.

*Glasco v. Ballard,* 452 S.E.2d 854, 855 (Va. 1995) (citation omitted).

The Court finds that the defendant has proved by a preponderance of the evidence that plaintiffs' are barred from relitigating the manner of Hoppers operation. First, the Court finds that the instant litigation is a collateral and different cause of action. "A 'cause of action' ... may be broadly characterized as an assertion of particular legal rights which have arisen out of a definable factual transaction." *Bates,* 202 S.E.2d at 922. The "transactions" relevant to this case are not limited to the operation of Hoppers, but also involve facts which occurred after the Hoppers case.[12]

■ The Court also finds that there is an identity of parties in both the Hoppers case and the instant case. Plaintiff Levine was President, Chief Operating Officer, and an owner of Marina Shores at the time of the Hoppers case. Plaintiff Marina Shores was the plaintiff in the Hoppers case. Finally, defendant McLeskey owned a 50% interest in Cohn–Phillips at the time of the Hoppers litigation making him a privy of Cohn–Phillips.

Third, the Court finds that the issue of how Hoppers was managed was actually litigated before the jury. Plaintiffs state that "The jury simply noted 'No' on Instruction No. 10 which addressed whether any of the specific problems associated with Hoppers constituted a breach of the lease ... and did

---

patible restaurant (albeit without a raucous, bawdy atmosphere).
(Pls.' Br. in Resp. to Def.'s Mot. for Summ.J. at 176.)

12. For this reason the Court declines to apply the doctrine of *res judicata* (claim preclusion) to this case. Under this doctrine "[a] valid, personal judgment on the merits in favor of the defendant bars relitigation of the *Same cause of action,* or any part thereof which could have been litigated between the same parties and their privies." *Bates,* 202 S.E.2d at 920 (emphasis added).

not necessarily find that these problems did not occur at all or that they were not serious." (Pls' Br. in Resp. to Def.'s Mot. for Summ. J. at 150.) However, considering the specificity of items b, e, g, h, and i of Instruction # 10, and the fact that paragraph 4(c) of the lease states that "Lessee shall not use or permit the use of the Premises in any manner that will tend to create waste or nuisance or tend to disturb other tenants",[13] the Court believes that answering no to the above-mentioned items is the equivalent to finding that they did not occur or were not serious. Furthermore, the Virginia Court of Appeals has noted that "an appropriate test for determining the identity of issues involved in former and subsequent actions is 'whether the same evidence will support both actions.'" *Graham v. Virginia Elec. & Power Co.*, 230 Va. 273, 337 S.E.2d 260, 263 (1985) (citation omitted).

Fourth, the Court finds that the issue of how Hoppers operated was essential to the prior judgment. Lastly, the Court finds that the prior proceeding resulted in a valid, final judgment against the plaintiffs. Plaintiffs have not alleged that the trial court's judgment in the Hoppers' case was invalid,[14] and the trial court's judgment was final. "Final judgments ... are judicial orders which terminate the litigation and dispose of the case leaving nothing further for the court to do." W. HAMILTON BRYSON, HANDBOOK ON VIRGINIA CIVIL PROCEDURE, 461 (1989). There was nothing further for the trial court to do once it entered its judgment in the case.[15]

■ In their brief, plaintiffs seek to persuade the Court that the doctrine of collateral estoppel is not applicable to the jury's findings of fact since the Virginia Supreme Court overturned the trial court's judgment. However, the Virginia Supreme Court has often stated that where a trial court submits a question of fact to a jury, the jury's finding is binding on the appellate court. *See, e.g., Vaughan v. Eatoon*, 197 Va. 459, 89 S.E.2d 914, 917 (1955) (stating: "It is primarily the province of a jury to weigh and evaluate the factual meaning of the testimony of all witnesses and, unless it clearly appears that they have abused or transcended the wide scope of their authority as reasonable men, their finding of fact should not be disturbed."); *Smith v. Smith*, 195 Va. 722, 80 S.E.2d 415, 419 (1954) (stating: "The court submitted this plain question of fact to the jury and its verdict is binding on us, as it was on the trial court."); *Hickerson v. Burner*, 186 Va. 66, 41 S.E.2d 451, 452 (1947) (stating: "These irreconcilable conflicts the jury's verdict has resolved in favor of the defendant, and its finding is, of course, binding on us."). The Court does not find that the Hoppers jury abused their authority as reasonable persons. Moreover, the Virginia Supreme Court based its reversal on the issue of whether the lease was properly terminated due to nonpayment of rent, not on the manner of Hoppers operation. Therefore, this Court is bound by the jury's factual finding.

## B. Sham Litigation.

Plaintiffs claim that McLeskey directed Cohn–Phillips to file a series of sham lawsuits against them as part of his anticompetitive scheme. Specifically, plaintiffs allege that McLeskey's legal positions in the Hoppers' case, the Conspiracy Act Litigation, the Rent Litigation, the Escrow Litigation, and the Alter Ego Litigation were objectively baseless. The Court disagrees. It is the Court's finding that none of these cases

---

13. (Ex. 14. in Vol. 1 of Ex. in Supp. of Def.'s Mot. for Summ. J.)

14. Nor could they, according to the Court's understanding of Virginia law. Generally, a court's judgment is invalid only when it should not have decided the case. *See, e.g., In re Dwyer*, 18 Va.App. 437, 445 S.E.2d 157, 158 (1994) (stating that: "No court can 'render a valid judgment when necessary parties to a proceeding are not before the court.'") (citation omitted); *Patterson v. Anderson*, 194 Va. 557, 74 S.E.2d 195, 202

(1953) (stating: "A valid judgment cannot be predicated upon a complaint which does not state a cause of action.").

15. Virginia courts have sometimes also required mutuality of estoppel, meaning that "one cannot assert collateral estoppel unless he would have been similarly precluded had the prior litigation of the issue reached the opposite result." *Bates*, 202 S.E.2d at 921. The court finds that mutuality of estoppel also exists in this case.

meets the definition of sham as delineated by the Supreme Court.[16]

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,* —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Supreme Court held that "an objectively reasonable effort to litigate cannot be a sham regardless of subjective intent." *Id.* at ——, 113 S.Ct. at 1926. *Columbia Pictures* was a case where the High Court further explained the Noerr doctrine. In brief, this doctrine states that those who petition the government to take actions which may produce a monopoly are generally immune from antitrust liability. *See Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 528–29, 5 L.Ed.2d 464 (1961). In *Columbia Pictures* the Supreme Court outlined a two part test for determining whether a lawsuit constitutes sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, then the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. *Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.* Under [the] second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor."

*Id.* (emphasis added) (citations omitted). Therefore, the Court must first examine each lawsuit to determine if an objective litigant could conclude that the suits were reasonably calculated to elicit a favorable outcome. If the litigation meets this first criteria, the Court need not examine McLeskey's subjective motivation.

### 1. The Hoppers Case.

■ Plaintiffs submit that Cohn–Phillips' counterclaims in the Hoppers case were objectively baseless because the Virginia Supreme Court determined that the lease clearly stated that nonpayment of rent could result in immediate termination of the lease. This Court is not persuaded by plaintiffs' argument. An excerpt of the language from the Virginia Supreme Court opinion explains this Court's rationale. "Cohn–Phillips contends, *and the trial court held,* that the letter [of termination] from Marina Shores' counsel was not a 'lawful means' of terminating the lease and that Marina Shores was required to comply with the five-day notice provision contained in Code § 55–225." [17] *Marina Shores, Ltd. v. Cohn–Phillips, Ltd.,* 435 S.E.2d at 138.

The Court finds that Cohn–Phillips' counterclaims were not objectively baseless for two reasons. First, the Court notes that both the Hoppers jury and trial judge determined that Cohn–Phillips did not breach the restaurant lease. Therefore, the Court finds that an objective litigant could conclude that the counterclaims would result in a favorable outcome, as it did at the trial level. As the United States Supreme Court stated in *Columbia Pictures:*

> A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham. On the other hand, when the antitrust defendant has lost the underlying litigation, a court must "resist the understandable temptation to engage in post hoc reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or without foundation."

**16.** Since the Court has determined that the litigation was not a sham, there is no need to determine whether McLeskey authorized the lawsuits in question.

**17.** The relevant part of Virginia Code § 55–225 states:

> If any tenant or lessee of premises in a city or town ... being in default in the payment of rent, shall so continue for five days after notice, in writing, requiring the possession of the premises or the payment of rent, such tenant or lessee shall thereby forfeit his right to the possession. In such case the possession of the defendant may, at the option of the landlord or lessor, be deemed unlawful, and he may proceed to recover [possession].

VA.CODE ANN. § 55–225 (Michie 1994).

—— U.S. at ——, 113 S.Ct. 1920, at 1929 (citations omitted).

### 2. *The Conspiracy Act Litigation.*

■ Plaintiffs claim that the Conspiracy Act Litigation was also objectively baseless. In this case, Cohn–Phillips sought an injunction pursuant to the Virginia Conspiracy Act to prevent Marina Shores from interfering with the operation of the restaurant.

On April 1, 1992, the Hoppers jury had found that Marina Shores conspired to injure Cohn–Phillips' business in violation of these laws. (*See* Pls.' Br. in Resp. to Def.'s Mot. for Summ. J. at 41.) Cohn–Phillips' complaint in the Conspiracy Act Litigation was filed on or about May 27, 1992. (Isbrandtsen Aff. at ¶ 14, Ex. 13 in Vol. VI of Ex. in Supp. of Def.'s Mot. for Summ. J.) The trial judge in the Hoppers case did not overturn the jury's conspiracy verdict until July 24, 1992. (*See* Pls.' Br. in Resp. to Def.'s Mot. for Summ. J. at 41.)

In view of the Cohn–Phillips' favorable jury verdict on the conspiracy issue and the timetable recounted above, the Court finds that the Conspiracy Act Litigation was not objectively baseless.

### 3. *The Rent Litigation.*

■ Marina Shores initiated the Rent Litigation to recover rent due for the months of June, July, August, and September of 1992.[18] Cohn–Phillips counterclaimed that Marina Shores had breached the restaurant's lease by interfering with its quiet possession and by failing to execute a memorandum of the restaurant lease for recording. Plaintiffs allege that the counterclaims were objectively baseless because "those claims depend on Cohn–Phillips' right to occupy the leased premises after June 2, 1991, when the lease with Marina Shores was terminated." (Pls.'

Br. in Resp. to Def.'s Mot. for Summ. J. at 164.) However, according to plaintiffs, the Rent Litigation was brought approximately one year before the Virginia Supreme Court overturned the Hoppers judgment. *Id.* Based on the fact that at the time the counterclaims were filed the Virginia Supreme Court had not yet overturned the Hoppers judgment, the Court finds that Cohn–Phillips had probable cause to raise the counterclaims. "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." *Columbia Pictures,* —— U.S. at ——, 113 S.Ct. at 1929.[19]

### 4. *The Escrow Litigation.*

Following the Virginia Supreme Court's ruling overturning the judgment in favor of Cohn–Phillips, Marina Shores demanded the escrowed rent. By the time of this demand, McLeskey and Cohn had been assigned Cohn–Phillips' rights to the escrow fund. Cohn–Phillips claimed that Marina Shores was not entitled to the money because its harassment and tortious interference had rendered the use of the restaurant worthless. Marina Shores filed a detinue action to recover the money, to which Cohn–Phillips demurred and filed a declaratory action.

■ The Court finds that the Escrow Litigation was not objectively baseless. Marina Shores filed a detinue action to recover the money, which apparently was procedurally improper.[20] Furthermore, it is clear to the Court that there was a dispute as to who was entitled to the money, and a declaratory judgment was necessary to determine this dispute. Plaintiffs seek to have the Court consider McLeskey's subjective intent in refusing to release the escrowed funds. For example, plaintiffs state that McLeskey has

18. Recall that the parties had escrowed rent in a joint account through May 1992. After that month, Cohn–Phillips claimed an offset due to the jury's financial verdict in their favor. (Pls.' Br. in Resp. to Def.'s Mot. for Summ.J. at 166.)

19. The United States Supreme Court went on to state "The notion of probable cause ... requires the plaintiff to prove that the defendant lacked probable cause to institute an unsuccessful civil lawsuit and that the defendant pressed the action for an improper, malicious purpose." *Id.* How-

ever, Cohn–Phillips has stayed the litigation pending the resolution of the instant case. (*See* Pls.' Br. in Resp. to Def.'s Mot. for Summ.J. at 164; Br. in Supp. of Def.'s Mot. for Summ. J. on Pl.'s Antitrust Claims at 80.)

20. The Court notes that the Virginia Beach Circuit Court granted Cohn–Phillips' demurrer, overruled Marina Shores' demurrer, and dismissed the detinue action.

continued this litigation "[f]or no other purpose than to delay payment of that sum...." (Pls.' Br. in Resp. to Def.'s Mot. for Summ. J. at 167.) However, the Court finds that an objective litigant at the time the litigation was instituted could conclude that the suit was reasonably calculated to elicit a favorable outcome, and will not examine McLeskey's subjective motivation.

### 5. *The Alter Ego Litigation.*

Plaintiffs state that "[i]f there was no basis for the assertion of a counterclaim in the Hoppers Litigation, there could be no basis for the assertion of virtually identical claims against the Levines as alter ego of Marina Shores." (Pls.' Br. in Resp. to Def.'s Mot. for Summ. J. at 171.) For the reasons stated above in reference to the Hoppers litigation, the Court finds that the Alter Ego litigation also was not a sham.

### V. *THE SHERMAN ANTITRUST ACT AND RELATED STATE CLAIMS (COUNTS I, II, III, IV, and V)*

Section 1 of the Sherman Antitrust Act states that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1988). Similarly, the relevant part of Virginia's antitrust laws states that: "Every contract, combination or conspiracy in restraint of trade or commerce of this Commonwealth is unlawful." VA.CODE ANN. § 59.1–9.5 (Michie 1994). The Virginia General Assembly has determined that the state's antitrust laws "shall be applied and construed to effectuate [their] general purposes in harmony with judicial interpretation of comparable federal statutory provisions." VA.CODE ANN. § 59.1–9.17. Therefore, for the purposes of defendant McLeskey's summary judgment motions, the Court will use federal case law to examine plaintiffs' antitrust claims.

At a minimum, the following elements must be met in order establish a § 1 violation:

(1) the activities must be in or affect interstate commerce or foreign commerce; (2) the activities must be performed by two or more persons; (3) the activities must be the result of concerted action; (4) the concerted action must constitute a restraint on trade or commerce; and (5) the restraint must be unreasonable.

*See* 2 EARL W. KINTNER, FEDERAL ANTITRUST LAW § 9.1 at 5 (1980) (footnotes omitted).[21] McLeskey challenges plaintiffs' § 1 claims on several grounds which will be addressed below.

### A. Plaintiff Levine's claims under § 1 of the Sherman Antitrust Act and the Virginia Antitrust Act, Code § 59.1–9.5. (Counts I and IV)

Levine claims that McLeskey violated § 1 of the Sherman Antitrust Act and § 59.1–9.5 of the Virginia Antitrust Act by conspiring with Norman Cohn and others to unlawfully and unreasonably restrain her trade and business as a developer of real property. However, the Court finds that her entire conspiracy claim rests on two alleged actions by the defendant: his detrimental management of Hoppers and his sham lawsuits. (Pls.' Br. in Resp. to Def.'s Mot. for Summ. J. at 144–52 and 175–77.) Since the Court has determined that plaintiffs' are collaterally estopped from relitigating the adverse findings on the management of Hoppers II and that the lawsuits were not sham litigation, Levine cannot establish the necessary element of concerted action for her antitrust claims. This fact alone is sufficient to grant McLeskey's motion for summary judgment.

Furthermore, the Court finds that even if Levine could rely on Hoppers management or McLeskey's lawsuits as evidence of a conspiracy, her antitrust claims must fail. She asserts that she has been re-

---

**21.** Likewise, the Fourth Circuit Court of Appeals, in *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 702 (4th Cir.1991), stated:

> To prove a violation of section one of the Sherman Act ... a plaintiff must show the existence of an agreement in the form of a

contract, combination, or conspiracy that imposes and unreasonable restraint on trade.... Proof of concerted action requires evidence of a relationship between at least two legally distinct persons or entities.

strained in her efforts to develop real estate, primarily an apartment complex and two retail facilities. Yet Levine has not provided the Court with a relevant market for this claim, nor has she shown that McLeskey plays a dominant role in any real estate market. "Absent this market power, any restraint on trade created by the defendant['s] actions is unlikely to implicate section one." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir.1991).

In cases where the alleged anticompetitive activities are not illegal *per se*, the Fourth Circuit has required that the "[plaintiff] ... prove what market he contends was restrained and that the defendants played a significant role in the relevant market." *Id.*[22] Levine's report from Dr. Robert Stoner only establishes the relevant product and geographic markets for marina services. (*See* Pls.' Ex. 100).

■ Finally, with respect to Levine's Sherman Antitrust Act claim, the Court finds that she has no standing to bring the claim. In addition to §§ 1 and 2 of the Sherman Act, Levine seeks relief under § 4 of the Clayton Act, 15 U.S.C. § 15 (1988). Section 4 states that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States ..." But as the Supreme Court stated in *Associated General Contractors, Inc., v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "the question whether the [plaintiff] may recover for the injury it allegedly suffered by reason of the defendants' [actions] cannot be answered simply by reference to the broad language of § 4." *Id.* at 535, 103 S.Ct. at 907.

In *Associated General Contractors*, the Supreme Court suggested that courts should analyze six factors when determining antitrust standing. First, the courts should examine whether the plaintiff is a "consumer or competitor in the market in which trade was restrained." *Id.* at 539, 103 S.Ct. at 909. Second, courts should look at whether the injury "is of the type that the antitrust statute was intended to forestall." *Id.* at 540, 103 S.Ct. at 909. Third, courts should look at the "directness or indirectness of the asserted injury." *Id.* Fourth, courts should examine whether there is "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to bring the suit. *Id.* at 542, 103 S.Ct. at 910–11. Fifth, courts should examine whether the "damages claim is ... highly speculative." *Id.* Sixth, courts should examine whether there is a "risk of duplicative recoveries ... or the danger of complex apportionment of damages." *Id.* at 544, 103 S.Ct. at 911. *See also Westchester Radiological Associates v. Empire Blue Cross & Blue Shield, Inc.*, 659 F.Supp. 132, 136 (S.D.N.Y. 1987) (noting all but one of these factors).

Levine has not alleged that she was a consumer in the market for marina services. In addition, the Court finds that while she is a real estate developer, she is not a competitor in the marina services market.[23] Secondly, the Court finds that Levine did not sustain any injuries of the type which the antitrust laws seek to prevent. Levine claims she suffered damages to her business of developing property. Since these projects are at best, loosely connected to marina services, the Court finds that her injuries were not related to McLeskey's alleged attempts to restrain trade. Third, even if Levine may be a competitor in the market for marina services, any possible marina-related antitrust

---

**22.** Anticompetitive acts which have been deemed illegal *per se* include "horizontal price-fixing, division of markets, resale price maintenance, tying arrangements and group boycotts." KINTNER, § 9.20 at 57–58. Plaintiffs have not alleged any activities which the Court deems are illegal *per se*, and therefore, the Court proceeds under the Rule of Reason. *See Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (explaining the Rule of Reason).

**23.** The Court notes that the *Westchester* court, citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483–84, 102 S.Ct. 2540, 2550–51, 73 L.Ed.2d 149 (1982), held that "[a]n antitrust plaintiff need not be either a competitor or a consumer in the relevant market in order to have antitrust standing." However, based on the language of *Associated General Contractors*, 459 U.S. at 539, 103 S.Ct. at 909, this Court declines to adopt the *Westchester* court's maxim.

injuries were sustained by Marina Shores. Fourth, the Court finds that Marina Shores would be the proper party to bring a § 1 claim against Mcleskey. Fifth, the Court finds that *Levine's* claims for damages are highly speculative.[24] Among other damages, she seeks lost profits for an undeveloped 324–unit apartment complex, an undeveloped 12–acre shopping center, and an undeveloped four-acre shopping center or boat repair shop. Sixth, the Court finds that since Marina Shores also alleged a § 1 injury, there would be a danger of duplicative recovery.

For these reasons, the Court **GRANTS** defendant's motion for summary judgment on Levine's claims under § 1 of the Sherman Act and the Virginia Antitrust Act, Code § 59.1–9.5.

**B. Marina Shores' claims under § 1 of the Sherman Antitrust Act and the Virginia Antitrust Act, Code § 59.1–9.5. (Counts II and V)**

For the reason stated above, specifically, that plaintiffs' cannot satisfy the conspiracy element for these antitrust counts, the Court **GRANTS** defendant's motion for summary judgment as to Counts II and V (as it relates to the Virginia Antitrust Act, Code § 59.1–9.5).

**C. Marina Shore's claims under § 2 of the Sherman Antitrust Act and the Virginia Antitrust Act, Code § 59.1–9.6. (Counts III and V)**

Section 2 of the Sherman Antitrust Act states that: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce of the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2. Similarly, § 59.1–9.6 of the Virginia Code states: "every conspiracy, combination, or attempt to monopolize, or monopolization of, trade or commerce of this Commonwealth is

unlawful." VA.CODE ANN. § 59.1–9.6 (Michie 1994).

Section 2 of the Sherman Act lists three separate and distinct offenses: monopolization, attempted monopolization, and combination or conspiracy to monopolize. KINTNER § 11.1 at 301 and § 11.7 at 314. Marina Shores alleges "that McLeskey monopolized and attempted to monopolize the market for marina services ..." (*See* Pls.' Compl. ¶ 51.)

The offense of monopolization must consist of two elements. First, the defendant must possess monopoly power in the relevant market. Second, the defendant must willfully acquire or maintain that power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). McLeskey challenges Marina Shores' claim of monopolization on the ground that the marina cannot prove that Lynnhaven Marine possesses monopoly power.

Monopoly power is defined as the power to control prices or exclude competition. *See Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. at 1005, 100 L.Ed. 1264 (1956). Where monopoly power cannot be shown specifically, "it may be inferred by a showing that the firm in question controls a large percentage of the relevant market." KINTNER § 11.8 at 315. The Fourth Circuit has noted that monopolies exist when a defendant controls 70–100% of the relevant market. *See White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir.1974). Plaintiff Marina Shores argues that the issue of whether McLeskey possesses monopoly power is one of fact which should be decided at trial. Based on the facts of the instant case the Court believes that this is not necessary, and grants summary judgment to the defendant on plaintiff's claim of monopolization.

Marina Shores has presented market share evidence for dry slips for three

---

**24.** As the Fourth Circuit stated in *Wilder Enterprises v. Allied Artists Pictures*, 632 F.2d 1135 (4th Cir.1980): "The necessary elements for recovery under § 1 of the Act are: (1) an agreement, conspiracy, or combination among the defendants in restraint of trade; (2) injury to the plaintiff's business and property as a direct result; (3) *damages that are capable of reasonable ascertainment and are not speculative or conjectural." Id.* at 1139 (emphasis added).

market areas in which the parties compete.[25] In the Lynnhaven Inlet market area, Lynnhaven Marine has 55.7% of the dry slip capacity and Marina Shores has 42.6% of the dry slip capacity. (*See* Pl.Ex. 100 at Ex. 10.) Likewise, in the Lynnhaven/Rudee Inlet market area, Lynnhaven Marine has 55.7% of the dry slips and Marina Shores has 42.6% of the dry slips. *Id.* Finally, in the Lynnhaven Inlet/Rudee Inlet/Little Creek market area, Lynnhaven Marine has 41.5% of the dry slips and Marina Shores has 31.8% of the dry slips. *Id.* While the Court notes that at least one authority has stated that "a detailed inquiry into other market characteristics is necessary ... if the defendant's market share is in the range of fifty to seventy-five or eighty percent" KINTNER § 12.7 at 358, the Court finds that this is not a *per se* rule.

For example, the Third Circuit has stated: "A significantly larger market share than 55 percent has been required to demonstrate *prima facie* monopoly power." *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171 (3rd Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *see also Advanced Health–Care Services v. Giles Memorial Hosp.*, 846 F.Supp. 488, 494 n. 9 (W.D.Va.1994) (citing several authorities stating that more than 50–60% is necessary to show monopoly power). Similarly, the Second Circuit has stated that while over a 90% share of the relevant market may be enough to show monopoly power, "it is doubtful whether sixty or sixty-four percent would be enough." *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945).

The Court finds that the situation in the instant case is similar to that presented in *Brager & Co., Inc., v. Leumi Securities Corp.*, 429 F.Supp. 1341 (S.D.N.Y.1977), where the court stated: "The force of plaintiff's claims under Sections 1 and 2 is somewhat attenuated by the circumstance that although it alleges defendants control sixty per cent of the market, plaintiff itself controls almost all of the balance, with the result that together they have almost complete control." *Id.* at 1348. Therefore, the Court finds that defendant McLeskey does not have monopoly power in the market for marina services.

As to Marina Shores' claim of attempted monopolization, plaintiff needs to show that the defendant had a specific intent to achieve a monopoly in the market, took anticompetitive or predatory actions, and that there was a dangerous probability that the defendant would succeed in achieving monopoly power. *See Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 926 (4th Cir.1990). The court finds that plaintiff's claim fails on the final two elements.

First, McLeskey's alleged anticompetitive or predatory actions are based on the operation of Hoppers II and the alleged sham litigation, which the Court has already addressed. Second, Marina Shores has not shown that McLeskey has a dangerous probability of achieving monopoly power. Plaintiff's own statistics show that the parties almost evenly split the market. Furthermore, the Court finds that plaintiff's claims that McLeskey could someday buy Marina Shores are speculative. This speculation clearly assumes that McLeskey would be the successful bidder in any forced sale.

For the reasons stated above, the Court **GRANTS** defendant's motion for summary judgment on Counts III and V (as it relates to the Virginia Antitrust Act, Code § 59.1–9.6).

## VI. DEFAMATION (COUNTS VI AND VII)

Plaintiffs discuss three separate claims of defamation in their brief in opposition to summary judgment: McLeskey's statement to Jay Archbell, the statements of Richard Karangelen, and McLeskey's statements to Jimmy Hall.[26] Since no other allegations of

---

**25.** Since Lynnhaven Marine only has dry slip capacity, the Court need not examine the figures for wet slips or total slips.

**26.** Although Virginia has a defamation statute, Va.Code § 8.01–45, which states that "[a]ll words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace," plaintiffs do not sue under this statute. Instead, they rely on the common law tort of defamation.

defamation were discussed in plaintiffs' briefs, the Court assumes that these are plaintiffs only defamation claims.

For the reasons that follow, the Court **GRANTS** summary judgment on all the claims of defamation.

## A. Elements of the Claim of Defamation.

■ All parties to this suit are private individuals and there are no assertions that the alleged defamatory statements involved issues of public concern. Therefore, under Virginia law, in order to succeed on a claim of defamation, plaintiffs must prove by a preponderance of the evidence (1) that the statements were false, and (2) that McLeskey knew the statements were false, or believing them to be true, either lacked reasonable grounds for such belief or acted negligently in failing to ascertain the truth. *See, e.g., Ingles v. Dively,* 246 Va. 244, 251, 435 S.E.2d 641, 645 (1993), *citing Gazette, Inc. v. Harris,* 229 Va. 1, 15, 325 S.E.2d 713, 724–25, *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643, *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985).

"The burden is on the plaintiffs to prove falsity," and truth is an absolute defense to a charge of defamation in almost all cases. *Seabolt v. Westmoreland Coal Co.,* 703 F.Supp. 1235, 1242 (W.D.Va.1989) (citations omitted). "It is not necessary to prove the literal truth of the statements made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially true.' " *Id.* at 1242, n. 3, *quoting Saleeby v. Free Press, Inc.,* 197 Va. 761, 763, 91 S.E.2d 405, 407 (1956).

■ At common law, defamatory words which are actionable at law include "[t]hose which prejudice such person in his or her profession or trade." *Great Coastal Express, Inc. v. Ellington,* 230 Va. 142, 147, 334 S.E.2d 846, 849 (1985), *citing Fleming v. Moore,* 221 Va. 884, 889, 275 S.E.2d 632, 635 (1981). A corporation may be defamed per se by statements that "cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business." *Swengler v. ITT Corp. Electro–Optical Products Div.,* 993 F.2d 1063, 1071 (4th Cir.1993), *quoting General Products Co., Inc. v. Meredith Corp.,* 526 F.Supp. 546, 549–50 (E.D.Va. 1981). In the case of a private individual bringing a suit for defamatory words involving no matters of public concern, if the trial judge determines such words to be actionable per se at common law, compensatory damages from injury to reputation, humiliation, and embarrassment are presumed. *Ellington,* 230 Va. at 151, 334 S.E.2d 846. But that private individual "must still prove negligence as a predicate for recovery, even if the words published are actionable per se." *Id.* at 152, 334 S.E.2d 846.

■ Both plaintiffs also ask for punitive damages, for which a higher standard applies. In order to recover punitive damages, plaintiffs must prove actual malice, that is knowledge that the publication was false or with reckless disregard for whether it was false or not. *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *Ellington,* 230 Va. at 149 and n. 3, 334 S.E.2d 846.

## B. Analysis of the Claim of Defamation.

■ The Court notes at the onset that it rejects defendant's argument that plaintiffs' claims are barred because they failed to allege specific words in their complaint or in their answers to interrogatories. This case is being heard in federal court and the complaint will be construed, whether for sufficiency or other purposes, under the liberal notice pleading requirements of the federal rules. See Fed.R.Civ.P. 81(c). Moreover, there is no question that McLeskey had ample notice of the claim, as evidenced by his extensive briefs addressing all statements at issue, and even some that are no longer in issue. Additionally, he did not ask for a more definite statement.

### 1. *Levine* (Count VI)

■ Plaintiff Levine also alleges that McLeskey stated to Jay Archbell and James Hall that her personal wealth was at such risk that bankruptcy was imminent. The

Court does not find that McLeskey has established truth as a defense to these claims. Defendant continually refers to Levine's wealth in the briefs he submits to the Court. It would be possible, then, for a jury to find that McLeskey knew any statement about Levine personally being close to bankruptcy was knowingly false or negligently false.

However, regarding the specific allegations of·defamation, Levine has not submitted to the Court an affidavit, a deposition, or any statement of Jay Archbell.[27] The Court can only decide the issues on the evidence before it. Since Levine has submitted no evidence in support of the claim that McLeskey defamed her to Jay Archbell, summary judgment is appropriate for the defendant.

The final issue of defamation involves statements allegedly made to James Hall regarding Levine going bankrupt. The Court first notes that as there is no specific statute of limitations for a defamation claim under Virginia law, the catch-all statute of limitations, Va.Code § 8.01–248, applies. This section establishes a one year statue of limitations for actions not otherwise covered by a statute of limitations. This case was filed on May 20, 1994. Therefore, any statements to James Hall made prior to May 20, 1993 are barred by the one year statute of limitations.

■■■ Levine asserts that over the course of the last two years, including late 1993 and early 1994, Hall was present when McLeskey stated both plaintiffs were on the verge of bankruptcy[28]; the December 10, 1994 affidavit of Hall supports this contention. However, on November 29, 1994, just two weeks earlier, Mr. Hall testified at deposition that McLeskey remarked only upon two topics: Levine's sexual preference and her deficiencies as a marina operator (Hall Dep. at 100). There is no mention of Levine being on the verge of bankruptcy. In fact, Mr. Hall testified at his deposition that he could not remember specifically what McLeskey said regarding Levine's ability to run the marina, but that he did not say very much. Levine cannot now create an issue of fact by submitting a later contradictory affidavit by Hall. *Military Serv. Realty, Inc. v. Realty Consultants of Virginia,* 823 F.2d 829, 832 (4th Cir.1987). The Fourth Circuit declared in *Military Serv. Realty* that "the affidavit appears to be an after-the fact attempt to overcome the admissions elicited from the expert at deposition. Military cannot thwart the purposes of Rule 56 by creating issues of fact through affidavits that contradict its own depositions." *Id.* (citations omitted). Likewise, the Court will not allow Levine to thwart the purposes of Rule 56 by creating issues of fact through an affidavit that contradicts Mr. Hall's own earlier deposition testimony.

### 2. *Marina Shores* (Count VII)

Marina Shores' claim of defamation is based upon the statements of Richard Karangelen, who allegedly said or implied to Mr. and Mrs. Cecil Hatfield that Lynnhaven marine was going bankrupt. Plaintiff alleges that this defamatory statement originated with McLeskey. Additionally, plaintiff alleges that Jay Archbell overheard McLeskey refer to Marina Shores as going bankrupt.

■■■ McLeskey asserts that the overwhelming evidence is that Marina Shores was bankrupt; hence any statements regarding this fact are immune from suit because they are true. Truth is·an absolute defense to a charge of defamation in almost all cases. *Seabolt, supra,* at 1242. The first definition in Black's Law Dictionary for "bankrupt" is: "The state or condition of a person (individual, partnership, corporation, municipality) who is unable to pay its debts as they are, or become, due." *Black's Law Dictionary* 147 (6th Ed.1990). It is also fair to state that this constitutes the plain and usual meaning of the word "bankrupt".

■■■ The evidence in this case is that Marina Shores has never been able to pay its

---

27. The Court recognizes that in early January, less than one month before this case was scheduled for trial, the Magistrate Judge granted plaintiff leave to take the deposition of Jay Archbell. To date, the deposition has not been taken. The Court must base its ruling on the record before it.

28. As stated above, only Levine can seek relief on this claim of defamation.

debts as they become due, and it is plaintiffs' burden to prove falsity. *Seabolt*, at 1242. Both parties agree that Marina Shores was losing money, that Levine was not paying her note to Signet as it came due, and that at one time she considered filing bankruptcy for Marina Shores. Therefore, a description of Marina Shores as bankrupt was not a false statement, given the fact that under the law "[i]t is not necessary to prove the literal truth of the statements made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially true.'" *Seabolt, supra*, at 1242. Therefore, McLeskey has established truth as a defense to Marina Shores' claims of defamation.

### VII. SLANDER OF TITLE (COUNT VIII)

In her complaint, Levine bases this claim upon the two *lis pendens*. However, in the voluminous papers submitted to the Court, Levine addresses only the first *lis pendens*, and she discusses no damages she incurred as a result of the second *lis pendens*. Furthermore, Levine admits that she had no knowledge of the second *lis pendens* until after the Virginia Supreme Court made its ruling. (Levine Dep. at 408). Therefore, the Court considers this claim of slander of title to property as based upon the filing of the first *lis pendens*.

#### A. Elements of the Claim of Slander of Title.

■ Generally, to succeed on an action for slander of title, the plaintiff must prove (1) that the defendant maliciously published false words, (2) that the false words disparaged plaintiff's property, and (3) that the publication caused plaintiff to suffer special damages. *Warren v. Bank of Marion*, 618 F.Supp. 317, 320 (W.D.Va.1985); *see also, Lomah Electronic Targetry, Inc. v. ATA Training Aids Aust. Pty. Ltd.*, 828 F.2d 1021, 1022 (4th Cir.) (1987) ("Although there is no authoritative Virginia precedent, the

federal district courts in both districts of Virginia have concluded that the tort is recognized by the law of Virginia"), *citing General Products Co. Inc. v. Meredith Corp.*, 526 F.Supp. 546, 553 n. 9 (E.D.Va.1981) and *Warren v. Bank of Marion* at 320. Plaintiff has failed to show that the defendant published the words in question or that she suffered special damages. Thus, summary judgment is **GRANTED** for this claim.

#### B. Analysis of the Slander of Title Claim.

■ As an initial matter, the Court notes that defendant wishes to reopen the question of whether slander of title is a personal claim or one based in property. This Court ruled, in the initial summary judgment order, based upon *Warren, supra*, that slander of title was a property claim, and therefore was assignable. The Court stands firm in that determination.

■ The evidence before the Court is that McLeskey did not file the memorandum of *lis pendens*, Cohn–Phillips did so; moreover, Cohn–Phillips' attorney, Mr. Isbrandtsen, developed the idea and Norman Cohn signed the memorandum. Therefore, Levine has failed to show that McLeskey maliciously *published* false words, as required to set out a prima facie case of slander of title. *See, Warren, supra*. As the signatur, Norman Cohn published the *lis pendens*. And there is a valid argument that since he was acting on behalf of the corporation, Cohn–Phillips published the *lis pendens*. But Levine offers no evidence to support that McLeskey published the *lis pendens*. In fact, she admits that it is possible that Cohn, "showing uncharacteristic independence," acted on his own to record the two *lis pendens*, "with the purpose of furthering his principle's goal." (Pl. Brief at 114). The Court, however, finds no basis in law to hold McLeskey responsible for the publications of others[29], even if the intent of such publication was to please McLeskey.

---

**29.** The Court notes that this is not a case of republication, as can happen in a claim for defamation. In this slander of property claim, the

issue in this case, the *lis pendens*, is the original publication that allegedly damaged the property.

In addition, although the Court can find no Virginia law interpreting what constitutes "special damages" in the context of a suit for slander of title, the Court finds that it can analogize this element to the requirement of "special damages" in a malicious prosecution claim. Levine alleges she suffered actual damages, but does not address the requirement of "special damages". She asserts injuries already addressed in the discussion of McLeskey's alleged tortious interference with Levine's business expectancies. As discussed *infra*, Levine is unable to show that McLeskey is liable for damages with regard to the forbearance agreement with Signet Bank or with regard to GE choosing not to finance the apartment project. The Court finds that Levine suffered no damages resulting from McLeskey's alleged actions, and hence she has not suffered "special damages" as required to state a prima facie case of slander to title.

## VIII. MALICIOUS PROSECUTION (COUNTS IX AND X)

The prosecution in question on this claim is the counterclaim filed against Marina Shores by Cohn–Phillips, and the subsequent effort to pierce Marina Shores' corporate veil with the second *lis pendens*, filed in conjunction with the claim that Cohn–Phillips had an equitable interest in Levine's property[30]. Taking the facts in the light most favorable to plaintiffs, it is clear that there was malice between the parties; furthermore, "the existence or nonexistence of malice is ordinarily a question for the jury to determine from all the circumstances of the case." *Gaut v. Pyles*, 212 Va. 39, 42, 181 S.E.2d 645, 647 (1971) (citations omitted). It is also clear that the prosecutions terminated not unfavorably for the plaintiffs, when the Virginia Supreme Court overturned the judgment against them and when the second *lis pendens* was released on November 3, 1993. Therefore, the key questions for this claim are whether Cohn–Phillips had probable

cause to bring the legal actions and whether plaintiffs have suffered special injury. Because the Court finds that there was probable cause to bring the legal actions in question, and because the Court finds no special injury, the Court **GRANTS** defendant's motion for summary judgment on the malicious prosecution claims.

### A. Elements of a Malicious Prosecution Claim

The Virginia Supreme Court has clearly laid out the elements of malicious prosecution. When the claim stems from criminal proceedings, the elements are: (1) the prosecution was set on foot by the defendant and it terminated in a manner not unfavorable to the plaintiff; (2) it was instituted by or procured by the cooperation of the defendant; (3) it was without probable cause; and (4) it was malicious. *See, e.g., Pallas v. Zaharopoulos*, 219 Va. 751, 754, 250 S.E.2d 357, 359 (1979). Additionally, when the claim stems from civil proceedings, "the plaintiff must allege and prove arrest of her person, seizure of his property or special injury incurred." *Ayyildiz v. Kidd*, 220 Va. 1080, 1084, 266 S.E.2d 108, 112 (1980). Special injury focuses on the intent of the defendant in the prosecution of the original case, and it occurs when the defendant maliciously makes use of the legal process with the intent to vex and distress the plaintiff. *Id.* Special injury is also defined as "a special loss or unusual hardship resulting from the malicious prosecution of the original action, ... that would not stem normally" from such an action. *Ely v. Whitlock*, 238 Va. 670, 674, 385 S.E.2d 893, 895 (1989), *quoting Ayyildiz*, 220 Va. at 1084, 266 S.E.2d 108. "Malicious prosecution actions are not favored in Virginia." *Pallas*, 219 Va. at 754, 250 S.E.2d 357.

If a defendant "acts in good faith upon the advice of reputable counsel, after full disclosure of all material facts, he has

---

**30.** A claim of malicious prosecution based upon the first *lis pendens* is barred by the statute of limitations. The catch-all statute of limitations in Virginia is Va.Code § 8.01–248, which establishes a one year statute of limitations for actions not otherwise covered by a statute of limitations, such as malicious prosecution actions. Since the

first *lis pendens* was finally quashed by order entered November 30, 1992, and plaintiffs brought this action on May 20, 1994, the statute of limitations had run. A claim of malicious prosecution based upon the second *lis pendens* is not barred, since it was not released until November 3, 1993.

probable cause to support his action." *Id.* at 755, 250 S.E.2d 357. Probable cause is a complete defense to an action of malicious prosecution, even if the attorney's advice is wrong. *Id.* (citations omitted). Furthermore, although the law will infer malice from lack of probable cause, it will not infer a lack of probable cause from malice. *Id.*

## B. Analysis of the Malicious Prosecution Claim

■■■■ Defendant McLeskey has demonstrated that Cohn–Phillips had probable cause to bring the actions it did based upon the fact that it was following the advice of counsel.[31] In order to establish the advice of counsel defense to a malicious prosecution action, the defendant must prove (1) that he sought the advice of reputable counsel because he wished to be informed of the law; (2) that he fully, correctly, and honestly disclosed all material facts which he knew—or should have known upon a reasonably careful investigation—about the guilt of the party accused; and (3) that in good faith he followed his counsel's advice in causing the plaintiff's arrest. *Chipouras v. A J & L Corp.*, 223 Va 511, 515, 290 S.E.2d 859, 861 (1982) *citing Pallas, supra,* at 755 (other citations omitted). Defendant McLeskey and the attorney in the prior actions, Isbrandtsen, claim that all three of these elements existed during the course of the prior litigation. Plaintiffs have put forth no proof that Cohn–Phillips filed the actions in question without advice of Isbrandtsen, or that Cohn–Phillips acted outside of his advice. Nor have they supplied any evidence that Cohn–Phillips failed to disclose material facts to its attorney. Under the law, a defendant who "acts in good faith upon the advice of reputable counsel, after full disclosure of all material facts," has probable cause to support his

action. *Pallas, supra,* 219 Va. at 755, 250 S.E.2d 357. Probable cause is a complete defense to an action of malicious prosecution, even if the attorney's advice is wrong. *Id.* (citations omitted).

Plaintiffs contend that there is evidence that McLeskey, through Cohn, intended "destructive litigation" prior to the time he and Cohn consulted their attorney. Furthermore, they contend that there is evidence that the relationship between McLeskey and Isbrandtsen was akin to that of master and servant. Even taking these assertions as true for summary judgment purposes, plaintiffs still offer no real evidence that McLeskey (acting as Cohn–Phillips) did not act "in good faith upon the advice of reputable counsel, after full disclosure of all material facts." *Id.* Plaintiffs are confusing the elements of malice and probable cause. But the law will not infer lack of probable cause from malice. *Id.* The Court in *Pallas* found that there was animosity between the parties, but "good faith in seeking and following the advice of counsel is not determined by a client's motives." *Id.* at 757, 250 S.E.2d 357. Rather, a defendant to malicious prosecution must show that he "dealt honestly with his own attorney in an effort to ascertain the legal options available to resolve a controversy, and, having received legal advice based on all material facts," he must not have deviated from the recommended course of action. *Id.* If McLeskey "meets these requirements, *his motives are irrelevant.*" *Id.* (emphasis added). The Court finds that the defendant has established probable cause based upon reliance on counsel, and hence, has a complete defense as a matter of law to this malicious prosecution action.

■■■■ In addition, in order to proceed on a claim of malicious prosecution, since there are no allegations of seizure of person

---

31. The Court notes that plaintiffs are suing McLeskey in his personal capacity for prosecutions for which he was not a party. Cohn–Phillips was the party involved in bringing the counterclaims, the claim for piercing the corporate veil, and the claim and *lis pendens* regarding the land Marina Shores sits upon. Plaintiffs are alleging that the actions were "procured by the cooperation of" McLeskey. *Pallas v. Zaharopoulos,* 219 Va. 751, 754, 250 S.E.2d 357, 359 (1979). Plaintiffs would have to show McLeskey

had some control over the litigation or some significant involvement in the litigation at issue in order to be liable personally for malicious prosecution of an action brought by Cohn–Phillips. To fairly hold him accountable, McLeskey would need to be the "alter ego" of Cohn–Phillips. *See, Freezer v. Miller,* 163 Va. 180, 200, 176 S.E. 159, 166 (1934). As discussed previously, there is sufficient evidence that McLeskey in fact controlled Cohn–Phillips.

or property,[32] plaintiffs would have to make a showing of special injury, as required under *Ayyildiz, supra.* Plaintiffs have alleged severe harassment, emotional distress[33], and maliciousness on the part of the defendant. They also allege that because of the *lis pendens* they suffered the loss of the restructuring agreement and the ability to finance the apartment project. However, lost profits are insufficient to establish special injury. *See Ayyildiz,* 220 Va. at 1084, 266 S.E.2d 108 (lost profits would fall upon any defending physician in a medical malpractice action, and therefore did not constitute special injury). Also, since this claim is barred because of the statute of limitations insofar as it incorporates the first *lis pendens,* these damages, even if they were sufficient, may not come into play in this suit. The Court finds that plaintiffs do not allege special injury, because they do not allege hardships not usually faced by a defendant in an action for breach of lease, interference with business, conspiracy to injure a business, and claims on property.

## IX. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT XI)

Levine alleges that McLeskey committed the tort of intentional infliction of emotional distress, which caused her physical and mental pain, distress and anxiety. She seeks compensatory and punitive damages. The Court finds that Levine has not alleged conduct rising to the level of outrageousness required by the law, nor has she shown that she suffered the severe degree of emotional distress necessary to succeed on this claim under Virginia law. Therefore, the Court **GRANTS** defendant's motion for summary judgment as to the claim of intentional infliction of emotional distress.

### A. Elements of the Claim of Intentional Infliction of Emotional Distress

In order to set out a prima facie case for intentional infliction of emotional distress, Levine must show 1) that McLeskey's conduct was intentional or reckless, 2) that the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality, 3) that there was a causal connection between McLeskey's conduct and the emotional distress, and 4) that the emotional distress was severe. *Womack v. Eldridge,* 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974). The first element is satisfied if McLeskey had the specific purpose of inflicting emotional distress or where he intended his conduct and knew or should have known that the emotional distress would likely result. *Id.* The second element safeguards against frivolous suits in situations where only bad manners and mere hurt feelings are involved. *Id.* In order to satisfy the fourth prong, Levine must show that "the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo v. White,* 241 Va. 23, 27, 400 S.E.2d 160, 163 (1991).

Virginia courts do not favor actions for intentional infliction of emotional distress. *See, Ruth v. Fletcher,* 237 Va. 366, 373, 377 S.E.2d 412, 415–16 (1989). It is the Court that determines whether McLeskey's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; if reasonable men could differ, it is for the jury to determine. *Russo,* 241 Va. at 27, 400 S.E.2d 160 (citations omitted).

Levine "must show that the conduct complained of was 'so outrageous in character, and so extreme in degree, as to be beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Simmons v. Norfolk & Western Ry. Company,* 734 F.Supp. 230,

---

**32.** A *lis pendens* does not qualify. *Bray v. Landergren,* 161 Va. 699, 713, 172 S.E. 252 (1934).

**33.** Note that in *Ely v. Whitlock,* 238 Va. 670, 385 S.E.2d 893 (1989), a case of malicious prosecution based upon disciplinary proceedings against a lawyer, the Supreme Court of Virginia held that anxiety, great mental anguish, and unusual and unnecessary stress that threatened the plaintiff's physical well being are injuries that would normally stem from a disciplinary complaint. "Anyone whose livelihood is threatened by such a proceeding would necessarily feel some degree of mental anguish. Therefore, they do not sufficiently allege special injury." *Id.* at 674, 385 S.E.2d 893.

231 (W.D.Va.1990), *quoting Owens v. Ashland Oil, Inc.,* 708 F.Supp. 757 (W.D.Va. 1989). "Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." *Id.* at 231.

## B. Analysis of Intentional Infliction of Emotional Distress

Defendant McLeskey's argument for summary judgment focuses on the second and fourth prongs of *Womack,* the severity of his conduct and the severity of Levine's injury.[34] He does not contest the first and third prongs, that his acts were intentional or reckless and that there is a causal connection between his acts and Levine's emotional distress.

█ McLeskey asserts that Levine's complaints about his alleged acts constitute nothing more than annoyance or indignities. Levine claims that McLeskey's use of the word "bitch", his presence and behavior at the restaurant, and his description of her as homosexual constitute severe enough conduct that reasonable persons could conclude that the conduct offended "generally accepted standards of decency." *Womack, supra,* 215 Va. at 342, 210 S.E.2d 145. Levine does not offer an explanation of how this conduct goes beyond "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." *Simmons, supra,* at 231. The Court concludes that the conduct as alleged is not severe enough to rise to an actionable level under Virginia law.

█ Furthermore, even if the conduct in question did rise to an actionable level, Levine clearly has not shown that her emotional injury is so severe that a reasonable person could not be expected to endure it. *Russo, supra,* 241 Va. at 27, 400 S.E.2d 160. Levine never interrupted her normal schedule, nor does she appear to have ceased functioning normally. Levine maintains that she lost at least twenty-five pounds, was frequently found crying, and seriously contemplated suicide. She states that although medical treatment was probably indicated, she did not seek it because she feared the effect it would have on her husband and their relationship. This was, she asserts, far beyond what normal business competitors would expect to experience in the business world, and went beyond what a reasonable person should be expected to endure. However, under *Russo,* nervousness, inability to sleep, stress and its physical symptoms, withdrawing from activities, and being unable to concentrate do not qualify as the type of emotional distress that will state a cause of action in Virginia. *Id.* at 28, 400 S.E.2d 160. The *Russo* Court found that since there was no claim that the plaintiff

> ... had any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income ... the alleged effect on the plaintiff's sensitivities is not the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it.

*Id.*

The Court determines Levine has not alleged emotional distress rising to the level required to state a cause of action.

## X. TORTIOUS INTERFERENCE WITH CONTRACT (COUNTS XII AND XIII)

Plaintiff Levine claims that McLeskey tortiously interfered with her contracts with Signet Bank and with Marina Shores, and plaintiff Marina Shores alleges that McLeskey interfered with its restaurant lease with Cohn–Phillips.

For the reasons that follow, the Court **GRANTS** summary judgment for all of the tortious interference with contract claims.

### A. Elements of Tortious Interference with Contract

█ The Virginia Supreme Court laid out the elements of a tortious interference with contract claim in the key case of *Chaves v.*

---

**34.** McLeskey also alleges that this claim is barred by the statute of limitations. The Court disagrees, because the claim is for an ongoing injury caused by continued exposure to McLeskey's alleged conduct.

*Johnson,* 230 Va. 112, 335 S.E.2d 97 (1985). They are: (1) the existence of a valid contractual relationship or business expectancy; (2) the interferer had knowledge of the relationship or expectancy; (3) intentional interference that induced or caused a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy the intentional interference has disrupted. *See, id.* at 120, 335 S.E.2d 97; *Oksanen v. Page Memorial Hosp.,* 912 F.2d 73, 80 n. 9 (4th Cir.1990) (*quoting Chaves* ). "Thus, the interferer's knowledge of the business relationship and his intent to disturb it are requisite elements; malice is not." *Chaves,* 230 Va. at 120–21, 335 S.E.2d 97 (citations omitted).

## B. The Contracts between Levine and Signet Bank.

Levine has identified two contracts with Signet Bank with which McLeskey allegedly interfered: the Marina construction loan and the forbearance agreement between Levine and Signet bank.

### 1. *The Construction Loan*

 Levine argues in this claim that McLeskey knew of her loan with Signet bank to finance construction of the marina. Further, his attempts to destroy her weakened her business and caused her to default on her loan payments, which caused her damages. Assuming for summary judgment purposes that all of Levine's allegations are true, she has alleged no specific acts that McLeskey took to interfere with the construction loan. Moreover, this claim fails as a matter of law because, even if all of Levine's allegations were true, she has not alleged that McLeskey interfered with *Signet's* performance or attempted to induce *Signet* to breach the contract with Levine. Immediately prior to laying out the elements of this tort, *Chaves* states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise *causing the third person* not to perform the contract, is subject to liability to the other for the pecuniary loss result-

ing to the other from the *failure of the third person to perform* the contract.

*Id.* at 120, 335 S.E.2d 97 (emphasis added). Since it was Levine who breached the contract with Signet by not making the loan payments, Signet would be the proper party to sue for intentional interference with contract, not Levine.

### 2. *The Forbearance Agreement*

 Levine alleges that McLeskey, with knowledge of the forbearance agreement being negotiated between herself and Signet Bank, instituted groundless litigation and placement of the *lis pendens,* thereby thwarting final execution of the forbearance agreement directly before it was to be signed. Her damages were having to enter into a less favorable forbearance agreement the next year. In this claim, Levine maintains that McLeskey intentionally interfered with an expected contract so that the third party, Signet, did not perform. The four elements of tortious interference set out in *Chaves* apply in the case of a prospective contract. *Krantz v. Air Line Pilots Ass'n, Internat'l,* 245 Va. 202, 205–06, 427 S.E.2d 326, 328 (1993); *Wright v. Castles,* 232 Va. 218, 224, 349 S.E.2d 125, 129 (1986).

The Court finds that Levine fails to put forth evidence of the third prong of *Chaves, intentional interference* that induced or caused a termination of the expectancy. Levine has not shown that the *lis pendens* or the May 1992 litigation were filed with the intent to interfere with her forbearance agreement with Signet Bank. Rather, McLeskey asserts that Cohn–Phillips placed the *lis pendens* on the property, with advice of counsel, in order to protect its ability to collect the judgment it had against Marina Shores. The May 1992 litigation, which was the attempt to pierce the corporate veil, was also taken in order to protect Cohn–Phillips' judgment against Marina Shores. The statements of Cohn–Phillips' attorney, Isbrandtsen, support McLeskey's assertions that the intent of these proceedings was to protect Cohn–Phillips' judgment, not to interfere with Levine's forbearance agreement with Signet. Levine does not put forth any credible evidence to prove otherwise. Whether or

not an incidental effect of these proceedings was to hamper the forbearance agreement, under *Chaves,* in order for McLeskey to be held liable he must have intentionally interfered with the prospective contract. Therefore, because Levine fails to establish any evidence of intent, she fails to state a prima facie case of tortious interference with contract.

### C. The Contract between Marina Shores and Cohn–Phillips.

Marina Shores claims that McLeskey intentionally interfered with the lease between Marina Shores and Cohn–Phillips, under which Cohn–Phillips rented space and ran the Hoppers II restaurant. Neither party disputes that there was a valid contract between the restaurant and Marina Shores, that McLeskey had knowledge of the contract, that it was breached, and that the breach resulted in damage to Marina Shores. Under the third prong of *Chaves,* the only question is whether McLeskey intentionally interfered with the contract and caused the breach.

McLeskey argues for summary judgment on the ground that he was a passive investor in Cohn–Phillips and was generally uninvolved with its day to day operations. He claims Marina Shores has not produced evidence of an intentional, affirmative act by McLeskey that caused the breach in the lease.[35] The Court disagrees, and finds that the overwhelming evidence in this case[36] shows that once McLeskey invested in Cohn–Phillips, he in fact controlled the corporation. There is sufficient circumstantial evidence from which a jury could decide that if the rent was not paid it was McLeskey who made that decision.

**35.** McLeskey claims that the breach occurred regarding the May rent, due June 1, 1991, and that the evidence supports only the conclusion that it took a couple of extra days to calculate their percentage rent. However, the Supreme Court of Virginia ruled on this issue in *Marina Shores, Ltd. v. Cohn–Phillips, Ltd,* 246 Va. 222, 435 S.E.2d 136 (1993). It found that, as plaintiffs contend, Cohn–Phillips failed to pay rent on both the April rent due May 1 and the May rent due June 1, 1991. *Id.* at 225, 435 S.E.2d 136. McLeskey has produced no evidence to contradict the Virginia Supreme Court's statement of

However, assuming that McLeskey caused the failure to pay rent that caused the breach in the lease, all of the evidence shows he acted as Cohn–Phillips, not as an independent third party. As discussed above in the context of the construction loan, *Chaves* requires that an outsider intentionally and improperly interfere with a contract "between another and a third person" *Id.* at 120, 335 S.E.2d 97. This tort requires three parties, two parties to a contract and a third party interferer. But in this situation, as alleged by plaintiff, there exist only two parties: Marina Shores and McLeskey acting in his capacity as controller of the Cohn–Phillips corporation. To hold otherwise would mean that every time a corporation breached a lease, the corporation itself would be liable for the breach and the individual members acting for the corporation would be liable for tortious interference with contract.

### D. The Contract (Ground Lease) between Levine and Marina Shores.

Marina Shores rents the land upon which it sits from the Levines pursuant to a ground lease. In essence, since the Levines are the sole owners of Marina Shores and the rent payments are to be paid to the Levines, the claim is that McLeskey stopped Levine from paying herself rent.

McLeskey argues that this claim fails the first prong of *Chaves,* the existence of a valid contractual relationship or business expectancy, because the Marina paid no rent payments to Levine prior to McLeskey's involvement with Cohn–Phillips. Hence, McLeskey asks the Court to find that the contract was a sham. Levine argues she had a legal right to receive the $20,000 per month in rent and envisioned receiving the payments. The

fact, and this Court will follow the findings of the Virginia Supreme Court. In addition, the Supreme Court of Virginia found that Cohn–Phillips had in fact breached the lease by the failure to pay rent. *Id.*

**36.** This evidence includes McLeskey's 50% interest, the amount of money Cohn owed him, the testimony of Ms. Sehring that Cohn would take no money from her for a party because of all he owed McLeskey, and Levine's testimony regarding statements Cohn made to her.

Court finds that there was a valid contract between the parties.

However, although Levine passes the first prong of *Chaves*, she fails the second, that the intentional interference induced or caused a breach or termination of the relationship or expectancy. Under the terms of the Ground Lease Marina Shores "shall not be deemed to be in default hereunder in the payment of rent ... unless lessor shall first give to Lessee thirty (30) days' written notice of such default and Lessee fails to cure such default within such thirty (30) days." (Def. Ex. 13). There is no evidence that the Levines served written notice of default on Marina Shores. Therefore, the Court finds there was no breach, and accordingly, there can be no claim for tortious interference with the contract.

Moreover, in reviewing a document entitled Marina Shore's "Income and Expense Statement as of 12/31/92", the Court notes that at account no. 1006080, $240,000 was paid over the course of the year in ground rent. The Court finds, therefore, that there is a serious question regarding whether Levine also fails the fourth prong of *Chaves*, the resulting damages.

## XI. TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES (COUNTS XII AND XIII)

Levine alleges that McLeskey tortiously interfered with her business expectancies involving the development of a 324 unit apartment complex. Marina Shores contends that McLeskey tortiously interfered with its business expectancies regarding former members and its sales of goods and services to former members.

For the reasons that follow, the Court **GRANTS** summary judgment for all of the claims of tortious interference with business expectancies.

### A. Elements of Tortious Interference with Business Expectancies.

*Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69 (1984) recognized the tort of intentional interference with business relations. It was, however decided prior to *Chaves*,

*supra. Chaves* states clearly that it applies to a "valid contractual relationship or *business expectancy*". *Chaves*, 230 Va. at 120, 335 S.E.2d 97 (emphasis added). However, subsequent to *Chaves*, the Fourth Circuit has cited to *Glass* as the Virginia Supreme Court's definition of the elements of intentional interference with business relations. *LaRouche v. Nat'l Broadcasting Co., Inc.*, 780 F.2d 1134, 1138 (4th Cir.1986). Fortunately, the elements of this tort as laid out in *Glass* are virtually identical to those laid out in *Chaves*, so this Court's analysis will rely on both cases. The elements of intentional interference with business relations under Virginia law are: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued the relationship or realized the expectancy; and (4) damage to plaintiff. *Glass*, 228 Va. at 51–52, 321 S.E.2d 69.

Legitimate business competition is an affirmative defense, for which the burden rests upon the defendant. *Chaves*, 230 Va. at 121, 335 S.E.2d 97. Furthermore, under *American Tel. & Tel. Co. v. Eastern Pay Phones, Inc.*, 767 F.Supp. 1335 (E.D.Va. 1991), *opinion vacated on non-substantive grounds*, 789 F.Supp. 725 (E.D.Va.1992) ("*AT & T*"), continuing to do business is "not the type of expectancy protected by Virginia law," because under Virginia law, "[t]he expectancy of remaining in business is too general to support a tortious interference claim ..." *Id.* at 1340. "Instead, there must be a particular expectancy which it is reasonably certain will be realized." *Id. citing Glass, supra.*

### B. The Development of the 324 Unit Apartment Complex.

Levine alleges that McLeskey prevented her from building a 324 unit apartment complex on the remaining land on which the Marina is located. She contends that her specific business expectancy was a capital loan from GE Capital (GE) to finance the project. Levine asserts that she retained

Bruce Marcus at Cooper–Horowitz to assist her in locating development and construction financing. Marcus found two interested lenders, one of which was GE[37]. Marcus submitted an affidavit (plaintiff's ex. 86), in which he states he has considerable experience in and knowledge of investment mortgage financing and of the loaning practices of GE. He further states that he believes one, and perhaps both, of the interested firms would have extended financing for the project, except for the *lis pendens* on the property. Because of the litigation, Marcus believed the loan would not be approved, and he recommended to Levine that she not pursue financing efforts until the litigation picture became clearer. The Court finds that this is sufficient to constitute a business expectancy with a probability of future economic benefit to Levine, as required under *Glass* and *Chaves*.

In order to proceed on this claim, Levine must offer evidence that McLeskey intentionally interfered with her attempts to acquire financing for the apartment complex with GE, and a reasonable certainty that absent McLeskey's misconduct, she would have realized her expectancy of obtaining such financing. Levine cannot meet this burden because she did not return the application to GE, nor did she submit the good faith deposit required by GE. Levine argues that she did not have to engage in futile acts, and returning the application and deposit would have been futile, because GE would not have financed the project due to the *lis pendens* and pending litigation. However, the affidavit of Richard Thomas (Def. Ex. 29), GE's representative and the person who handled the discussions regarding the loan in question for GE, states clearly that in order for the loan to be considered, Levine had to complete and return the application with the deposit by November 30, 1992. GE's Credit Committee and other individuals would then have reviewed the application. When Levine failed to return the application, GE gave no further consideration to the loan. The Court finds that it was Levine's failure to return the application for credit and the deposit to

GE that eliminated her opportunity to secure a loan from GE.

 In addition, the second prong of *Glass* and *Chaves* is that McLeskey had knowledge of the business relationship. Levine asserts that she told McLeskey she wished to develop the apartments, and in addition, that she told McLeskey and one of his associates that the *lis pendens* was impeding her development of the site. She does not assert, however, that she told McLeskey or any of his associates that she was working on financing the project with GE, nor does she offer any other evidence that McLeskey had such knowledge. The Court cannot gleam, then, how Levine could show that her claim is "at least a reasonable probability rather than merely one of several equally surmisable possibilities." *Charleston Area Medical Center, supra,* at 247.

### C. Former Members of Marina Shores.

 Plaintiff Marina Shores contends that as a result of McLeskey's intentional interference, it lost members who opted not to renew their wet slip and dry storage leases. McLeskey asserts that Marina Shores is simply claiming an expectancy to continue in business. And under *AT & T, supra,* plaintiff does not set forth a case, because continuing to do business is "not the type of expectancy protected by Virginia law," and under Virginia law, "[t]he expectancy of remaining in business is too general to support a tortious interference claim ..." *Id.* at 1340. Rather, Marina Shores must identify a particular expectancy that is reasonably certain would have been realized. *Id.* Marina Shores contends that it is enough that it had members who it expected would renew their memberships in ensuing seasons of operations. The Court disagrees.

Perhaps if there were members who had withdrawn mid-season or members who informed Marina Shores that they would renew and then suddenly changed their minds plaintiff might have a specific enough claim. As pled, however, Marina Shores is arguing nothing more than a general expectancy to

---

37. The other company was ITT Real Estate Services. Levine's claim focuses solely on GE Capi-

tal; she does not discuss ITT Real Estate Services.

remain in business with all its customers. Accordingly, this claim is barred by *AT & T.*

### D. Sales of Goods and Services to Former Members of Marina Shores.

Marina Shores maintains that the same arguments that support McLeskey's tortious interference with former members applies to the loss of sales of goods and services to those former members. However, as with the loss of former members, Marina Shores has not pled a specific expectancy rather than a general expectancy to stay in business. Marina Shores cannot point to specific sales it would have made, nor can it offer the Court evidence of damages, other than some evidence of loss of fuel sales. In addition, the Court finds that McLeskey could not have knowledge of sales at unidentified times in the future of unidentified goods and services to unidentified members. The Court finds this claim is speculative, and is insufficient under the law to go forward.

### XII. THE VIRGINIA CONSPIRACY ACT CLAIMS (COUNTS XIV AND XV).

The Virginia Conspiracy Act makes it illegal for "two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever ..." VA.CODE ANN. § 18.2–499 (Michie 1994). As stated above, plaintiffs claim that McLeskey conspired with other persons injure them in their businesses.

The Court notes that where the directors and officers of a corporation can be shown to have a personal stake in achieving a corporation's illegal objective, they can be treated as separate entities for conspiracy purposes. *See Selman v. American Sports Underwriters, Inc.,* 697 F.Supp. 225, 239 (W.D.Va.) (stating: "The Fourth Circuit has found that, pursuant to Virginia law, the doctrine [of intracorporate immunity] does not apply when an agent of the corporation has an 'independent personal stake in achieving the corporation's illegal objective.' ") (citations omitted). However, for the reasons stated in Part V. A., the Court **GRANTS** defendant's motion for summary judgment on Counts XIV and XV.

### XIII. CONCLUSION

For the reasons discussed above, the Court **GRANTS** summary judgment to the defendant on all counts of plaintiffs' complaint.

The Clerk is **DIRECTED** to send a copy of this order to counsel for the plaintiffs and to counsel for the defendant.

It is so **ORDERED.**