CENTURY-21, GAIL BOSWELL & ASSOCIATES, INC., ET AL.

v.

HORACE B. ELDER

Record No. 891030

April 20, 1990

Present: All the Justices

*Frank F. Rennie, IV (Cowan & Owen*, on briefs), for appellants.
*Gregory B. Elder (Rowe & Elder*, on brief), for appellee.

JUSTICE LACY delivered the opinion of the Court.

In this action for damages based upon the tort of intentional interference with the performance of a contract by a third party, we must determine whether the plaintiff produced sufficient evidence to support the jury verdict in his favor.

Horace B. Elder sued Rhonda W. Dowdy and her employer, Century-21, Gail Boswell & Associates, Inc. (Century-21), for intentionally interfering with a real estate sales contract which Elder had entered into with Glenn E. Blanks and Lillian S. Blanks. The jury returned its verdict for Elder, and the trial court entered judgment on the verdict. We awarded the defendants an appeal.

Based on well-settled principles, we state the facts in the light most favorable to Elder. In December of 1986, the Blankses approached Dowdy, a real estate sales agent with Century-21 in Lynchburg, and asked her to help them find a home in the Lynchburg area. In the ensuing weeks, Dowdy showed the Blankses six or seven houses, none of which were to their liking. Although they had not found a suitable house, the Blankses listed their current home for sale with Dowdy on January 16, 1987.

On February 5, 1987, while Dowdy was attending a sales conference in Richmond, the Blankses saw a house Elder was building in the Lynchburg area. They contacted Elder and made arrangements to meet him at the house the following day. After the Blankses viewed the nearly completed house, Elder described the remaining work to be performed and stated that the house would contain 1,200 square feet of living space. Elder offered to sell the house to the Blankses for $59,000.

After the parties negotiated further, the Blankses agreed to a purchase price of $64,000, which included the house and some additional adjoining land. Elder prepared a handwritten contract which the Blankses signed on the hood of Elder's pick-up truck. Under the contract, Elder agreed to complete the house, seed the yard, install a laundry tub in the "roughed in" basement, and install a dishwasher. Closing on Elder's house was set for April 10, 1987, conditioned upon the sale of the Blankses' own home. In addition to a copy of the contract, Elder gave the Blankses a copy of the appraisal and a copy of the survey plat.

The same afternoon, Dowdy returned from Richmond and called the Blankses to inquire whether they wished to look at any houses. Mr. Blanks informed her that he and his wife had seen Elder's house, that they were interested in it, and asked Dowdy to get some information on the house. Dowdy called Elder's office to inquire about the house. However, the agent with whom she spoke did not know the status of the house and advised Dowdy to contact Elder.

Later the same afternoon, Elder went to the Blankses' house to obtain their signatures on a typed version of the contract which the parties had signed earlier in the day. While they were discussing the contract terms, Dowdy called to inform the Blankses that she could not get any information on Elder's house. Mr. Blanks asked Dowdy to research home prices in the area of Elder's house and told Dowdy that he and his wife "were interested in Mr. Elder's house and [he] thought [they] were going to go ahead with it." Dowdy asked Mr. Blanks to allow her to present the purchase offer contract to Elder if the Blankses decided to sign a contract on the house which would allow her to receive a commission on the sale.

The following day, February 7, 1987, Dowdy did a market analysis of the area by comparing Elder's house with four or five similar houses in the area. She called the Blankses and told them that the average price of houses in that area was somewhere "in the fifties".

During the next two weeks, the Blankses met with Elder at the house several times to discuss floor and wall coverings and to measure for draperies. On one of those occasions, Mr. Blanks measured the house and discovered it contained only 1,040 square feet. Additional disputes between the Blankses and Elder arose

during this period regarding the Blankses' expectations and Elder's representations.*

There was no further contact between the Blankses and Dowdy until February 20, 1987, when Dowdy called the Blankses to set a date to show their house to some prospective buyers. During this conversation, Mr. Blanks informed Dowdy that they were dissatisfied with Elder's house and were no longer interested in it. He asked her to show them some other houses.

On February 27, 1987, Dowdy took the Blankses to see two houses. After inspecting the second, on Deborah Drive in Lynchburg, the Blankses informed Dowdy that they were prepared to sign a contract for the property. Dowdy took the Blankses to her office where she started to draw up the contract. While Dowdy was explaining the terms of the contract, but before the Blankses signed it, Mr. Blanks told Dowdy that he and his wife previously had signed a contract to purchase Elder's house and that the closing was set for April 10, 1987. The sale was conditioned, however, upon their first selling their house.

Although Dowdy did not recommend that the Blankses seek legal assistance, Dowdy told the Blankses that they would be obligated to purchase Elder's house on April 10, 1987, if their own house sold before that date. In response, the Blankses reiterated their dissatisfaction with Elder's house and proceeded to sign the contract offering to purchase the Deborah Drive property. Closing was scheduled for April 20, 1987.

Two weeks later, on March 20, 1987, Elder saw the Blankses and asked if they had arranged financing to purchase his house. Mr. Blanks informed Elder that he and his wife were no longer interested in his house because they felt it had been misrepresented to them and Dowdy had informed them "that houses in that area were not selling for that."

The Blankses' house was sold on April 13, 1987, and they subsequently purchased the house on Deborah Drive. Elder sold his house in October of 1988.

Elder filed suit against the Blankses for breach of contract and against Dowdy and Century-21 for tortious interference with contractual rights. At the conclusion of Elder's evidence, the trial court denied Dowdy's motion to strike. At the conclusion of all the

---

* Although such terms were not contained in the contract, the Blankses claimed that Elder reneged on promises to clear a refuse pile from the property, to paint the trim of the house where oxidation had occurred, and to install hardwood rather than parquet flooring.

evidence, the trial court directed a verdict against the Blankses and submitted the issue of Dowdy's and Century-21's liability to the jury. After the jury returned its verdict in favor of Elder, the trial court refused the defendants' motion to set aside the jury verdict and entered judgment on the verdict.

■ We recently considered a tortious interference with contract cause of action in *Chaves* v. *Johnson,* 230 Va. 112, 335 S.E.2d 97 (1985), and set out the elements which a plaintiff must prove in order to establish a prima facie case. These elements are:

(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing the breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Id.* at 120, 335 S.E.2d at 102 (citation omitted).

On appeal, Dowdy and Century-21 argue that Elder, as a matter of law, failed to produce evidence establishing the second and third elements set out above. Elder argues that the jury was presented with sufficient evidence to conclude that Dowdy not only knew of the contractual relationship between the Blankses and Elder, but also intentionally caused the Blankses to breach their contract with him.

■ We agree with Elder that Dowdy's knowledge of a contractual relationship between Elder and the Blankses is supported by the evidence. Indeed, it is undisputed that on February 27, prior to the time the Blankses signed the offer to purchase the Deborah Drive residence, Dowdy was aware of Elder's contract with them. Furthermore, there was sufficient, although conflicting, evidence to allow the jury to conclude that Dowdy knew about the contract with Elder prior to February 27.

■ We disagree, however, that Elder produced sufficient evidence to make a prima facie showing that Dowdy engaged in "intentional interference inducing or causing" the Blankses to breach their contract with Elder. Elder relies on the following evidence to sustain this element of his cause of action: Dowdy told the Blankses that houses in the area were selling "in the fifties;" Dowdy never tried to contact Elder directly to discuss his house; Dowdy continued to show the Blankses houses after she knew

about the contract with Elder; Dowdy prepared the purchase offer contract on the Deborah Drive home and allowed the Blankses to sign it after she knew about the Elder contract; and Dowdy was involved in setting the closing date on the Deborah Drive property which was ten days after the closing date previously set for Elder's house.

■ The undisputed evidence, however, also shows that the Blankses requested Dowdy to give them information on the prices of houses in the area of Elder's house, requested Dowdy to show them additional houses in late February, and proceeded to sign the offer to purchase the Deborah Drive property after Dowdy told them of her understanding of their liability under their contract with Elder. Taken as a whole, this evidence pales in comparison with the evidence in *Chaves* which showed that the tortfeasor engaged in affirmative, intentional acts, including writing letters and attending meetings in which he verbally attacked both his victim and the contract award. As stated in *Chaves*, the tort is one "accomplished by words, . . . employed in pursuance of a scheme designed wrongfully to enrich the speaker at the expense of the victim." *Id.* at 122, 335 S.E.2d at 103.

■ We conclude that the evidence in this record, which is circumstantial at best, simply does not support, as a matter of law, the premise that Dowdy had any intent to interfere with the Elder contract or that any action by Dowdy induced or caused the Blankses to breach their contract with Elder. Elder, therefore, failed to establish a prima facie case of intentional interference with the performance of a contract by a third party. Accordingly, we will reverse the judgment of the trial court and enter final judgment here in favor of appellants.

*Reversed and final judgment.*