**DSC COMMUNICATIONS CORPORATION,**
Plaintiff,

**v.**

**PULSE COMMUNICATIONS INC., Defendant.**

**Civil Action No. 96–1447–A.**

United States District Court,
E.D. Virginia.
Alexandria Division.

June 10, 1997.

Ruffin B. Cordell, Fish & Richardson, Washington, DC, for Plaintiff.

William F. Dudine, David R. Francescani, Joseph B. Lerch, Martin E. Goldstein, Benjamin Levi, and Maryann Hayes, all of Darby & Darby, New York City, Jonathan T. Cain and Mary Catherine Zinsner, both of Mays & Valentine, LLP, McLean, VA, for Defendant.

## MEMORANDUM OPINION

HILTON, District Judge.

This case came before the Court for a trial with a jury. At the close of DSC's case, Pulsecom moved under Fed.R.Civ.P. 50 for judgment as a matter of law on all counts. The Court grants Pulsecom's motion on all counts for the reasons set forth below.

The plaintiff DSC Communications Corporation ("DSC") alleged that the defendant Pulse Communications Inc. ("Pulsecom") infringed DSC's copyrights on its Litespan telecommunications digital switching software, misappropriated DSC's trade secrets, tortiously interfered with DSC's economic opportunity and made false representations to the trade. DSC manufactures and markets a telecommunications digital switching system known as the Litespan 2000 System ("Litespan"). The customers for the Litespan system are primarily the Regional Bell Operating Companies ("RBOCs") including Bell Atlantic, NYNEX, Ameritech, Pacific Bell, U.S. West and Bell South. The Lites-

pan uses copyrighted software which operates through plug-in channel cards to provide residential service known in the market as "POTS" which stands for "Plain Old Telephone Service." These POTS cards perform the interface functions necessary to transmit telephone signals to and from the customer. DSC designs its POTS card as a software-based device, i.e. it includes a microprocessor and random access memory ("RAM") which temporarily downloads software into the POTS card memory to carry out the Litespan functions. The downloaded software is entitled "POTS Download Image" or "POTS–DI." The DSC POTS card microprocessor is configured to execute a software program known as the "DSC RPOTS boot code," which initializes the microprocessor, begins communications between the microprocessor and the POTS card back plane interface Application Specific Integrated Circuit ("ASIC"), and provides the microprocessor with its initial instruction set to enable further operations of the Litespan.

In 1993, Pulsecom began its efforts to reverse engineer the DSC POTS card. Pulsecom had previously succeeded in the reverse engineering and marketing of POTS and other plug-in cards for use in AT & T (Lucent) digital loop carrier systems. To reverse engineer the DSC card, Pulsecom purchased a Litespan through its agent, John Stubeda. Stubeda bought the system from Sunbelt Telecommunications, Inc. who bought it from GTE Supply, Inc., a DSC distributor. Stubeda requested Sunbelt to send the Litespan system to U.S. PICS, a Pennsylvania company that was near his home. Stubeda obtained a cashier's check from Pulsecom which was used to pay for the Litespan system. The Litespan system was delivered to U.S. PICS and was later shipped from U.S. PICS to Pulsecom.

The Litespan was delivered to Pulsecom, in the fall of 1993, with no license or other restrictions on its use. In 1994, Pulsecom completed its reverse engineered design and began to market its own POTS card as being compatible for use with the Litespan system. This card was designed exclusively for use in the Litespan system.

In February 1994, DSC proposed to sell Bell Atlantic $40 million worth of products including POTS cards for Bell Atlantic's Litespan systems. Pulsecom learned about the proposed deal and offered to sell Bell Atlantic Pulsecom POTS cards at a price below the price being offered by DSC. Bell Atlantic initially rejected DSC's offer. However, in March 1994, DSC entered into a contract with Bell Atlantic whereby Bell Atlantic agreed to purchase approximately $30 million worth of product from DSC on the same terms and conditions as had been previously offered by DSC. The agreement was subsequently lowered by Bell Atlantic to a $27 million deal.

During the 1994–96 period, Pulsecom placed a number of its POTS cards in the testing labs of Ameritech, Bell Atlantic and NYNEX. Pulsecom determined that its POTS cards were being prevented from working in the Litespan system by the lock-out software that had been installed by DSC in certain of these testing labs. In order to determine the reason that the Pulsecom POTS cards were being locked out from the Litespan system, Pulsecom sent a POTS card to NYNEX with a snooper board.

The snooper board was used to identify the memory locations in the Pulsecom boot code which were being accessed by the Litespan system so that Pulsecom could determine how the DSC lock-out was being achieved. Pulsecom was attempting to monitor access to the boot code on Pulsecom's own POTS card so that Pulsecom could find out what portions of the Pulsecom boot code were being read. Pulsecom obtained information from the snooper card at NYNEX that identified the locations in the Pulsecom boot code that the Litespan system was looking at in order to find out if the card was a DSC card or not. These tests did not capture any software from the Litespan, but simply recorded timing and accesses on Pulsecom's own POTS boot code to investigate DSC's lock-out card.

Pulsecom also engaged in testing of its POTS card in a Litespan machine at the testing labs at Bell South. Pulsecom employee John Bresnahan visited the Bell South labs and obtained information regarding cer-

tain commands from the Litespan manuals which were present at the Bell South labs. These commands given in a certain sequence were used to "provision" the Litespan system. The only information that Mr. Bresnahan took away from Bell South was the Litespan provision commands.

In 1996, Ameritech approved Pulsecom's POTS cards for use in its network and designated it as a second source for a compatible POTS card for the Litespan system.

Count I of the complaint charged Pulsecom with contributory copyright infringement of DSC's registered POTS–DI software. DSC claims that Pulsecom committed contributory copyright infringement by providing test POTS cards to various RBOCs because during the testing of Pulsecom's POTS cards, the RBOCs download DSC's POTS–DI software onto the Pulsecorn POTS card. DSC claims that this downloading is an unauthorized use and therefore a direct infringement by the RBOCs, and that since Pulsecom provided its POTS card to the RBOCs, Pulsecom was guilty of contributory infringement.

Section 117 of the Copyright Act provides:

Notwithstanding the provisions of Section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that is used in no other manner.

17 U.S.C. § 117. Thus, Section 117 statutorily limits a copyright owner's rights in that it permits the owner of a copy of a computer program to make certain copies of that program without the permission of the program's copyright owner. *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir. 1988).

■ Congress passed Section 117 knowing that computer users would need to make copies of computer software in order to utilize that software. *Aymes v. Bonelli*, 47 F.3d 23, 26 (2d Cir.1995) (citing H.R.Rep. No.

1307, 96th Cong., 2d Sess., Pt. I, at 23 (1980), reprinted in 1980 U.S.C.C.A.N. 6460, 6482)). Section 117 provides a legitimate holder of a computer program with permission to do that copying of the program which is necessary for him to be able to use it in his computer without running afoul of possible infringement actions. *Apple Computer Inc. v. Formula Int'l, Inc.*, 594 F.Supp. 617, 621 (C.D.Cal.1984) (citing CONTU Meeting No. 19 at 98–99 (January 1978)). The trend is to read Section 117 broadly. *See Data Prods., Inc. v. Reppart*, Civ. No. 89–1291–K, 1990 WL 198610, 1990 U.S. Dist. Lexis 16330, 18 U.S.P.Q.2d 1058 (D.Kan. Nov.28, 1990) (holding that cases which interpret Section 117 narrowly are against the weight of recent authority); *Foresight Resources Corp. v. Pfortmiller*, 719 F.Supp. 1006, 1009–10 (D.Kan.1989) (holding that legislative history and recent case law requires broad interpretation of Section 117); *Vault Corp., RAV Communications, Inc. v. Philipp Bros., Inc.*, No. 87 CIV 3366(LLS), 1988 WL 36174 (S.D.N.Y. April 13, 1988) (holding that Section 117 was intended by Congress to be read broadly); Stem, *Section 117 of the Copyright Act: Charter of Software Users' Rights or an Illusory Promise?*, 7 W.New Eng.L.Rev. 459 (1985) (broad reading of Section 117 warranted by legislative history).

Under Section 117, it is not an infringement for an RBOC as an "owner of a copy" of a computer program (namely, the POTS–DI software) to make or authorize the making of a copy as an "essential step" in the utilization of that program where the copy is used in no other manner. Furthermore, the existence of a license agreement between DSC and its customers does not preclude a finding that the RBOCs are "owners of a copy" for the purposes of Section 117. *See Foresight Resources*, 719 F.Supp. at 1009 (holding Section 117 applied despite existence of licensing agreement); *Vault Corp.*, 847 F.2d at 262. It is necessary to determine ownership of the copy, not whether the transaction with DSC involved a license to use the program. Nimmer, *The Law of Computer Technology*, ¶ 1.18[1], at 1–102. In this case, the transaction involves a single payment, giving the buyer an unlimited period in which it has a right to possession,

making transaction a sale. The RBOCs make a single payment for the Litespan software and obtain a perpetual license to use and maintain the same. It is clear that Section 117 was intended to encompass the RBOCs as legitimate holders of copies of the DSC POTS–DI software.

■ As discussed above, Section 117 provides that the owner of a copy of a computer program can make a copy or adaptation of that program as long as it is created as an "essential step" in the utilization of the program. In order for a POTS card to boot up in the Litespan, it is necessary for DSC's POTS–DI software to be temporarily downloaded into the RAM of the Pulsecom Pots cards. *See Allen–Myland, Inc. v. International Business Machines Corp.,* 746 F.Supp. 520, 536 (E.D.Pa.1990) (holding that Section 117(1) permits the copying of a program onto RAM in order to permit the computer to execute the program); *Vault Corp.,* 847 F.2d at 261 (holding that copying of software on to hard drive in order to study how it operated was allowable under Section 117); *Midway Mfg. Co. v. Strohon,* 564 F.Supp. 741, 745 n. 2 (N.D.Ill.1983) (holding § 117 is intended to permit owners of copies to make the programs compatible with their computer hardware or systems).

■ DSC claims that its license agreements with the RBOCs (Ameritech, NYNEX, Bell Atlantic and Bell South) prohibited the RBOCs from downloading the DSC POTS–DI software onto any POTS cards other than DSC manufactured or licensed POTS cards. These RBOC agreements have in common the following provisions: a non-exclusive market rights clause reserving to the RBOC the right to buy comparable equipment from a second source; a software rights clause granting to the RBOC the right to use the DSC software in the equipment for which it was intended; and a requirement that DSC comply with all federal laws in the performance of the agreement. However, DSC's Vice–President of Sales, Christopher Strunk testified that it was DSC's understanding of this clause that the DSC software "could be used for installation purposes or for any purposes that Bell Atlantic so chose in the operation of their system." The RBOCs were entitled to use the DSC software in testing comparable channel cards, including the Pulsecom POTS card. It would be nonsensical to give the RBOCs the right under the non-exclusive rights clause to buy comparable POTS cards from a second source but prevent the RBOCs from using such POTS cards in the Litespan system under the software rights clause. The software rights clause merely limits the RBOCs to use of the DSC software in the Litespan purchased from DSC but does not prohibit the RBOCs from using that software on compatible POTS cards.

■ In Counts II–IV of the Complaint DSC alleges that Pulsecom is liable as a direct infringer of DSC's copyrights in the POTS–DI software, RPOTS boot code software and the Litespan system software respectively. At the close of its case DSC withdrew its claim of infringement of their RPOTS boot code software. Pulsecom's copying of the DSC software were made as part of their reverse engineering process to develop a competing POTS card. Such copying for reverse engineering of a lawfully acquired system is permissible fair use. *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1523 (9th Cir.1992); 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.01[2][a], at 1–34 (1996).

■ The Copyright Act at 17 U.S.C. § 107 identifies factors to consider in deciding whether a particular instance of copying is fair use. The statute states that:

[F]air use of a copyrighted work, including such use by reproduction in copies ... for the purposes such as research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—(I) the purpose and character of the use, including whether such use is of a commercial nature of is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The purpose of the Copyright Act is to stimulate artistic activity for the general public good. *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 432, 104 S.Ct. 774, 783–84, 78 L.Ed.2d 574 (1984).

> [T]he fact that computer programs are distributed for public use in object code form often precludes public access to the ideas and functional concepts contained in those programs, and thus confers on the copyright owner a de facto monopoly over those ideas and functional concepts. That result defeats the fundamental purpose of the Copyright Act to encourage the production of original works by protection the expressive elements of those works while leaving the ideas, facts, and functional concepts in the public domain for others to build on.

*Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1527 (9th Cir.1992).

■ The Copyright Act, properly read and interpreted by the case law, allows the fair use defense to copyright infringement for those who have legally acquired the copyrighted work, and who reverse engineer the copyrighted work to understand the functional or unprotected elements of the work. In *Sega* the court found that the record established that the defendant engaged in "wholesale copying" of plaintiff's copyrighted computer program code as part of the development of a competing product, yet found that this copying was fair use. Similarly in this case, where the disassembly and copying of DSC's copyrighted programs was the only way to gain access to the ideas and functional elements embodied in the program, and given Pulsecom's legitimate reason for such access, namely development of a competing POTS card, such copying is fair use as a matter of law. *See Sega,* 977 F.2d at 1527–28. Reverse engineering object code to discern the unprotectable ideas in computer program is fair use. *Atari Games Corp. v. Nintendo of America, Inc.,* 975 F.2d 832, 843 (Fed.Cir.1992) (citing *Feist Publications v. Rural Tel. Serv. Co.,* 499 U.S. 340, 349–51, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991)).

DSC also asserts that Pulsecom is guilty of direct infringement by virtue of inserting a Pulsecorn POTS card into a Litespan machine at the testing labs at Bell South and NYNEX. There is no evidence that the insertion of the Pulsecom POTS card into the Bell South Litespan system was done without the permission of Bell South. Nor is there any evidence that the Pulsecom employee actually inserted a Pulsecom POTS card into the Bell South Litespan system. Regardless of who operated the Litespan machine, Bell South was the legitimate holder of a copy of the POTS–DI software and could authorize the making of a copy of the POTS–DI software on the Bell South machine. Furthermore, the Bell South testing was permissible, because it was merely a test on Bell South's Litespan system to determine how the Pulsecomn POTS card was being locked out of the Bell South Litespan.

The Pulsecom POTS card with an attached snooper board was inserted into a Litespan machine at NYNEX. There is no evidence that the card was inserted by Pulsecom. As noted above, the RBOCs have the right under Section 117 to make a copy of the POTS–DI software. Thus any copies of the POTS–DI software that were made by NYNEX in the course of testing the Pulsecom POTS card are protected under Section 117 of the Copyright Act. These tests did not capture any software from the Litespan, but simply recorded timing and accesses on Pulsecom's own POTS boot code to investigate DSC's lock-out card.

■ Count V of the complaint charged Pulsecom with misappropriating DSC's trade secrets. The Virginia Uniform Trade Secrets Act ("UTSA") provides a remedy of injunctive relief and damages against a person who misappropriates a trade secret. Va. Code Ann. §§ 59.1–337, 59.1–338. A trade secret is:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* at § 59.1–336; *see also Dionne v. Southeast Foam Converting & Packaging Inc.,* 240 Va. 297, 397 S.E.2d 110, 113 (1990). "Misappropriation" of a trade secret is defined as:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

    a. Used improper means to acquire knowledge of the trade secret; or

    b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

        (1) derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake.

Va.Code Ann. § 59.1–336. Improper means includes theft, bribery, misrepresentation, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. *Id.* The evidence showed that the Litespan system was purchased lawfully by Pulsecom on the open market, in order to reverse engineer a POTS card. Pulsecom's purchase of the Litespan system through Stubeda does not constitute improper means. No trade secrets were misappropriated by Pulsecom.

Pulsecom did not misappropriate any DSC trade secrets through its use of the snooper board at the NYNEX testing labs. The only information that Pulsecom retrieved from the snooper card at NYNEX was an identification of the locations in the Pulsecom boot code that the Litespan system was looking at in order to find out if the card was a DSC card or not. Furthermore, there was no evidence presented that the DSC lock-out software which was being accessed by Pulsecom was a trade secret.

DSC's expert, Dr. Magleby, testified that a Pulsecom employee had visited the Bell South labs and obtained information regarding certain commands from the Litespan manuals. Dr. Magleby testified that the sequence of theses commands were used to "provision" the Litespan system. The evidence did not establish that the information obtained by Pulsecom at the Bell South labs was a trade secret. The only information that Pulsecom took away from Bell South was the Litespan provision commands.

■ DSC's trade secret counts are preempted by 17 U.S.C. § 301. The Copyright Act provides:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State. 17 U.S.C. § 301(a).

The Fourth Circuit has recently construed this provision in *United States ex rel. Berge v. Trustees of Univ. of Ala.,* 104 F.3d 1453, 1463–64 (4th Cir.1997). In *Berge,* the Court held that Section 301 of the Copyright Act preempted the Alabama conversion statute in the allegedly converted work. The Fourth Circuit rejected the argument that the conversion claim was not preempted because the ideas embodied in a work covered by the Copyright Act do not fall within the scope of the Act. *Id.; see also National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 848–854 (2nd Cir.1997).

■ To avoid preemption, there must be an extra element that changes the nature of the state law action so that it is qualitatively different from a copyright infringement claim. *Berge,* 104 F.3d at 1463 (citing *Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 229–30 (4th Cir.1993)). DSC's trade secret claim contains no extra element from its

essential claim that the ideas contained within the DSC copyrighted software were misappropriated.

 In Count 6 DSC claims that Pulsecorn improperly interfered with DSC's business expectancy with respect to a proposed business deal between DSC and Bell Atlantic in February and March, 1994. The elements of a tortious interference claim are: (1) the existence of a valid contractual relationship or expectancy; (2) knowledge of the interferer of the relationship or expectancy; (3) intentional interference inducing or causing the breach or termination of the relationship or expectancy; and (4) resultant damage. *Levine v. McLeskey*, 881 F.Supp. 1030, 1055 (E.D.Va.1995); *Century–21 v. Elder*, 239 Va. 637, 640, 391 S.E.2d 296 (Va.1990). If the business relationship is an expectancy rather than a contract, the elements also include (5) a probability of future economic benefit; and (6) a reasonable certainty that absent defendants' intentional misconduct, plaintiffs would have continued the relationship or realized the expectancy. *Levine*, 881 F.Supp. at 1057.

Pulsecom had knowledge of DSC's proposed deal with Bell Atlantic. Pulsecom made a proposal to Bell Atlantic for POTS cards at a price which was below tile price being proposed by DSC for POTS cards. However, Pulsecom was not the proximate cause of Bell Atlantic's failure to proceed with the $40 million deal with DSC. There were a number of business reasons why Bell Atlantic did not proceed with the deal. Bell Atlantic often would enter into written agreements to purchase a specific dollar amount of product and cancel that order at the last minute for a variety of reasons. DSC did not have a reasonable expectation of entering into a deal with Bell Atlantic for $40 million in March, 1994. There was nothing improper in Pulsecom's actions in attempting to compete with DSC for Bell Atlantic's business for POTS cards.

For the reasons stated above, the Court finds that defendant's motion for judgment as a matter of law should be granted.