**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SIEGFRIED CONSTRUCTION,
INCORPORATED,
Plaintiff-Appellant,

v.

GULF INSURANCE COMPANY,
Defendant-Appellee,

and

No. 98-2808

JENNIFER BUILDERS, INCORPORATED, t/a
Jennifer Drywall, Incorporated,
Defendant.

ASSOCIATED BUILDERS AND
CONTRACTORS OF VIRGINIA,
INCORPORATED; THE SURETY
ASSOCIATION OF AMERICA; AMERICAN
INSURANCE ASSOCIATION,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-98-555-A)

Argued: October 28, 1999

Decided: February 2, 2000

Before WIDENER, WILKINS, and TRAXLER, Circuit Judges.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mark Peyser Friedlander, Jr., FRIEDLANDER & FRIEDLANDER, P.C., McLean, Virginia, for Appellant. Erica Swecker Beardsley, WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P., McLean, Virginia, for Appellee. **ON BRIEF:** Maurice Baskin, David C. Mancini, Charles W. Durant, VENABLE, BAET-JER & HOWARD, L.L.P., McLean, Virginia, for Amicus Curiae Associated Builders. Martha L. Perkins, AMERICAN INSURANCE ASSOCIATION, Washington, D.C.; Edward G. Gallagher, WICK-WIRE GAVIN, P.C., Vienna, Virginia, for Amicus Curiae Surety Association.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Siegfried Construction, Inc. ("Siegfried" or "SC") appeals from the district court's grant of judgment as a matter of law for Gulf Insurance Company ("Gulf"), the surety on behalf of Siegfried's subcontractor, Jennifer Builders, Inc. ("Jennifer"). The district court concluded that (1) Siegfried did not declare Jennifer to be in default, and (2) Siegfried did not provide Gulf with reasonable notice that Siegfried was arranging for the correction and completion of Jennifer's work. Based upon these findings, the district court determined as a matter of law that Siegfried had not met the requirements of the performance bond. We reverse and remand.

I.

Siegfried was the general contractor for the construction of a Sleep Inn Hotel in Rockville, Maryland. In this capacity, Siegfried hired numerous subcontractors to perform portions of the work. Siegfried

2

engaged Jennifer to install dry wall and door frames, hang valances, and complete some trim and finishing work. The subcontract required Jennifer to obtain a performance bond, which Gulf issued shortly after Jennifer began work on the hotel.**1**

_____

**1** The performance bond, which incorporated the subcontract by reference, in pertinent part provides:

> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise to remain in full force and effect.
>
> Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:
>
> 1. Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
>
> 2. Obligee, after reasonable notice to Surety may, or Surety upon demand of Obligee may, arrange for the performance of Principals' obligation under the subcontract subject to the provisions of paragraph 3 herein;
>
> 3. The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety shall pay to the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract. The term "balance of subcontract price," as used in this paragraph, shall mean the total amount payable by Obligee to Principal under the subcontract and amendments thereto, less the amounts heretofore properly paid by Obligee under the subcontract.

J.A. 17.

3

The Sleep Inn construction, however, did not proceed smoothly. The hotel was originally scheduled to be completed by August 9, 1997, but was not finished until September 19, 1997. In many cases the delays were caused by various subcontractors, including Jennifer. During the course of the construction, Siegfried repeatedly complained to Jennifer about the quality of work and the laborers provided. Specifically, Siegfried remonstrated that the metal door frames installed by Jennifer were crooked, dry wall was hung in the wrong sequences causing delays, piece workers hanging drywall had no designated foreman, only four to eight dry wall workers were on the job when more were needed to remain on schedule, dry wall was improperly fitted around electrical and plumbing boxes, and in many areas dry wall was improperly placed so that it bulged.

On July 14, 1997, Siegfried sent Jennifer a "Formal Notice of Termination for Failure to Perform." J.A. 183. The letter, in accordance with the subcontract,[2] gave Jennifer "three (3) days formal notification of [Siegfried's] intention to terminate your subcontract agreement

_____

[2] Article X of the subcontract provided that:

> If, in the opinion of SC, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workmen or materials of the proper quality, (2) fail in any respect to prosecute the work according to the current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of SC or of any other builder or subcontractor, . . . or (8) by any other action, indicate an unwillingness or inability to perform, or continue performing, hereunder then, after serving three days' written notice, unless the condition(s) specified in such notice shall have been eliminated within such three days, SC may, at its option (i) without voiding the other provisions of this Subcontract and without notice to Subcontractor's sureties, if any, take such steps as are necessary in SC's reasonable discretion, to overcome the condition(s), in which case the Subcontractor shall be liable to SC for the full cost thereof, (ii) terminate the Subcontract for default, or (iii) seek specific performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that specific performance may be necessary to avoid irreparable harm to SC and/or Owner. . . .

J.A. 170.

4

for default, unless acceptable corrections are effected by July 17, 1997." J.A. 183. The letter then set forth a number of grievances regarding Jennifer's workers and demanded that Jennifer take corrective action. On July 15, Siegfried sent a corrected termination letter to Jennifer further detailing problems with Jennifer's work and demanding prompt correction. Jennifer responded by making some changes, but Siegfried soon found that the original problems reoccurred.

On July 22, Siegfried sent a "Second Notice of Termination for Failure to Perform." J.A. 188. The second notice informed Jennifer that "Siegfried Construction intends, at its discretion, to terminate your subcontract agreement or to supplement your work forces in order to complete your work and the project on time." J.A. 188. The letter stated that Jennifer had failed to remedy the problems outlined in previous letters and set forth a schedule for the completion of Jennifer's work.

On July 26, Siegfried sent a "Follow-up to Second Notice of Termination for Failure to Perform." J.A. 190. Siegfried averred that "progress has not been maintained on certain key work activities and necessitates that [Siegfried] supplement your manpower with personnel capable of performing with acceptable quality of workmanship." J.A. 190. The supplementation was in accordance with Article X of the subcontract agreement. The letter contained a revised schedule for the completion of Jennifer's work and provided that Siegfried would notify Gulf of the problems unless Jennifer could show marked improvement.

Not satisfied with Jennifer's progress, Siegfried sent Gulf a "Notice of Claim" on July 28 in which Siegfried announced that it would "almost certainly submit a claim for reimbursement of costs associated with completing and correcting work performed by Jennifer." J.A. 197. By this communication, Siegfried also informed Gulf of the supplementation of Jennifer's workforce and Siegfried enclosed copies of the letters sent to Jennifer which threatened termination.

Gulf forwarded Siegfried's communication to COP, Inc. ("COP"), Gulf's investigator. On August 5, COP informed Siegfried that it had been retained "to investigate claims against[Jennifer's] bond." J.A.

5

198. COP acknowledged receipt of the letters Siegfried had sent to Jennifer and promised to contact Siegfried at the end of the investigation.

Shortly thereafter, Siegfried discussed the claim with COP in a telephone conversation. Siegfried presented evidence that it told COP that it "needed some help" either from Gulf or Jennifer to complete the work on the hotel. J.A. 107. Siegfried did not hear from COP or Gulf while construction proceeded, and there is some dispute concerning Jennifer's abandonment of the job. However, all parties agree that Siegfried never terminated Jennifer.

In January 1998, Siegfried submitted a claim on Jennifer's bond which Gulf refused to pay. Siegfried then brought suit in Virginia state court against Jennifer for breach of contract and against Gulf on the bond. The defendants removed the case to federal court, where a non-jury trial was held. At the conclusion of Siegfried's case, the court heard motions for judgment as a matter of law from Jennifer and Gulf. The court denied the former's motion, but granted the latter's. In ruling in Gulf's favor, the district court found that the July 28, 1997 letter to Gulf was not a proper declaration of default nor reasonable notice that Siegfried was arranging for the performance of Jennifer's contractual obligation. The case proceeded no further because Siegfried and Jennifer then stipulated to the amount of damages and the court entered judgment for Siegfried against Jennifer. Siegfried now appeals the court's grant of Gulf's motion for judgment as a matter of law.

II.

For a grant of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c), we review the district court's legal conclusions de novo, see Freeman v. Case Corp., 118 F.3d 1011, 1014 (4th Cir. 1997), cert. denied, 118 S. Ct. 739 (1998), and its findings of fact for clear error, see Carter v. Ball, 33 F.3d 450, 457 (4th Cir. 1994). Judgment as a matter of law is appropriate when, without weighing the credibility of witnesses, there can be but one reasonable conclusion as to the correct judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If, however, evidence viewed in a light most favorable to the nonmovant indicates that more than one conclu-

sion is plausible, judgment as a matter of law is improper. Id. at 250-51. Because the appeal from the district court is before us in diversity, see 28 U.S.C.A. § 1332 (West 1993 & Supp. 1998), we are bound by the substantive law of Virginia, see 28 U.S.C.A. § 1652 (West 1994); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), and the parties agree that Virginia law is controlling.

A.

Siegfried first challenges the district court's determination that Siegfried never declared Jennifer to be in default. A performance bond is simply a contract and thus we turn to Virginia's principles of contract interpretation to guide the resolution of this issue. The court's task is to enforce contracts as written, not to unilaterally alter the parties' obligations. See D.C. McClain, Inc. v. Arlington County, 452 S.E.2d 659, 662 (Va. 1995). In Virginia, surety bonds are liberally construed, see Fidelity & Deposit Co. v. A.J. Bailey, 133 S.E. 797, 797 (Va. 1926), and "[s]ureties for hire" are required to "abide by their contracts and pay everything which by fair intendment can be charged against them." C.S. Luck & Sons, Inc. v. Boatwright, 162 S.E. 53, 54 (Va. 1932).

Under the performance bond, Gulf is liable for Jennifer's breach of contract if two conditions occur: (1) Jennifer is in default, and (2) Siegfried declares Jennifer to be in default. Siegfried argues that it declared Jennifer in default by virtue of the four notices of termination and the July 28, 1997 notice of claim sent to Gulf.

1.

To determine whether there was a proper declaration of default, we must first define a "default," a term that neither the bond nor the subcontract specifically explicate. In general, a default is defined as "the omission or failure to perform a legal or contractual duty." Black's Law Dictionary 417 (6th ed. 1990). According to the Virginia Supreme Court, a "building contractor defaults in the performance of his contract if he furnishes defective materials or workmanship." Clevert v. Jeff W. Soden, Inc., 400 S.E.2d 181, 183 (Va. 1991). Stated another way, "a builder's breach in the performance of his contract, i.e., a defective performance, also would be a `default' in that con-

7

tract." Id. The subcontract before us, though not specifically defining default, describes a "failure to perform" as follows: failure to provide skilled workers and quality materials; failure to complete work on time, causing delays for Siegfried or other subcontractors; or any other action indicating an inability or unwillingness to perform. "When contract terms are clear and unambiguous, the words used by the parties must be given their plain and ordinary meanings." Gordonsville Energy v. Virginia Elec. & Power Co. , 512 S.E.2d 811, 817 (Va. 1999).

Siegfried's uncontradicted evidence indicates that the workers Jennifer provided were too few and without adequate supervision, that workmanship was substandard, and that Jennifer's deficiencies were causing delays in construction. Viewing this series of failings in a light most favorable to Siegfried, Jennifer's failure to perform was defective, material, and "defeat[ed] an essential purpose of the contract." Horton v. Horton, 487 S.E.2d 200, 204 (Va. 1997); see also RW Power Partners v. Virginia Elec. & Power Co., 899 F. Supp. 1490, 1496 (E.D. Va. 1995) (stating that under Virginia law a material breach deprives the party of an expected benefit and "goes to the root of the contract") (internal quotation marks omitted). As the provisions of the subcontract and the performance bond must be read together, see New Amsterdam Cas. Co. v. Moretrench Corp., 35 S.E.2d 74, 77 (Va. 1945), we conclude that the evidence presented during Siegfried's case in chief demonstrates that Jennifer was in default.

2.

Turning next to the second condition of the bond, the declaration of default, the district judge concluded as a matter of law that Siegfried never declared Jennifer to be in default. We disagree.

We are aware that the evidence in this case is not complete; and in passing on a challenge to a judgment as a matter of law, we must view the evidence in a light most favorable to Siegfried. In so doing, we find that Siegfried's evidence was sufficient to establish that it declared Jennifer in default. In communications to Jennifer and Gulf, Siegfried outlined the problems with Jennifer's laborers, their work, and the resulting delays. Siegfried repeatedly threatened Jennifer with

8

formal termination for default if changes were not implemented.**3** These communications could reasonably be interpreted as pronounce-ments that Jennifer was not fulfilling its fundamental contractual obli-gations and that a claim for payment under the bond would be forthcoming. Thus, Siegfried presented sufficient evidence that it complied with the bond's condition that Jennifer be declared in default.

In support of the district court's ruling, Gulf avers that Siegfried's statement that it would "almost certainly submit a claim for reim-bursement" was equivocal and cannot be interpreted as a declaration of default. J.A. 197. However, under the bond, Siegfried could collect from Gulf only if the reasonable cost of completion exceeded the bal-ance of the subcontract. Thus, Siegfried could not have known the amount of its claim, if any, until it completed the work originally assigned to Jennifer. Under the terms of the bond, Siegfried could not have made a more definite statement regarding the specific amount of the likely claim.

Gulf further argues that Siegfried had to actually terminate Jennifer to declare default. Though other courts have required obligees to ter-minate a subcontractor to invoke a surety's obligations, see L & A Contracting Co. v. Southern Concrete Servs., Inc., 17 F.3d 106, 111 (5th Cir. 1994); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F. Supp. 82, 85-86 (D. Conn. 1997), Virginia law does not counsel this result. Had the parties intended that Sieg-fried actually terminate Jennifer before making a claim on the bond, "such a provision would surely, in clear language, have been inserted in the bond." Phoenix Ins. Co. v. Lester Bros., Inc., 127 S.E.2d 432, 436 (Va. 1962). Were the court to read such a requirement into the bond, we would be drafting rather than enforcing the bond as written. See D.C. McClain, Inc., 452 S.E.2d at 662 (stating that courts must enforce contracts as written).

Moreover, equating termination with default could effect a major change in the construction industry in Virginia. When the general

_____

**3** Though Siegfried did not initially copy Gulf on the four notices of ter-mination sent to Jennifer, Gulf did receive these letters when Siegfried submitted the July 28, 1997 notice of claim to Gulf.

9

contractor notices deficiencies in a subcontractor's work, generally all parties benefit if the subcontractor remains on the job. This common practice keeps the subcontractor working and permits the correction of problems and mistakes. The actual termination of a subcontractor is disruptive to the entire construction process because it adds to delays and expenses as new subcontractors must be found and retained, often at higher rates because of the premium paid for availability.

Similarly, Gulf contends that its involvement in the construction of the Sleep Inn -- absent Jennifer's termination-- could have resulted in Jennifer bringing a suit for tortious interference with contractual relations.[4] We find this to be an unlikely result. Considering that Siegfried arranged for the correction and completion of Jennifer's work, it is unclear how Gulf would have been faced with a suit for tortious interference had it simply paid the claim. Likewise, Gulf's exercise of other options under the bond, such as arranging for the completion of Jennifer's work, could not have been the cause of a breach of the subcontract or Jennifer's termination. Jennifer's failure to perform prior to the declaration of default would be considered the cause of a breach or termination. Even assuming Gulf's fear has some merit, the danger arises from the wording of Gulf's own bond. If Gulf believes termination is necessary to avoid a tortious interference suit, the better course would be to add this requirement to its performance bond. As the bond currently reads, the obligee is simply required to declare default, not terminate the principal.

Furthermore, Gulf's assertion that termination was a necessary component of a declaration of default is inconsistent with Gulf's conduct. In response to Siegfried's notice of claim, Gulf's investigator promised to contact Siegfried after it reviewed the claim. If termina-

_____

[4] The elements of tortious interference with contractual relations are as follows: "`(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.'" Century-21 v. Elder, 391 S.E.2d 296, 298-99 (Va. 1990) (quoting Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985)).

10

tion of Jennifer was the determining factor triggering Gulf's responsibilities under the bond, then Siegfried could reasonably have expected Gulf to say so immediately. Instead, Gulf's hiring of COP to investigate the matter and COP's initial response could easily have convinced Siegfried that payment or assistance would be forthcoming. In fact, Siegfried told COP that Siegfried needed help from Gulf or Jennifer to complete the work. In the face of this pronouncement, COP, Gulf's representative, voiced no impediment to Gulf's involvement.

In sum, we conclude that Siegfried presented adequate evidence to find that it declared Jennifer in default. In so holding, we reject Gulf's argument that termination must precede a declaration of default.

B.

Siegfried next challenges the district court's conclusion that Gulf was denied its options under the bond because Siegfried neglected to provide reasonable notice that it was arranging for the correction and completion of Jennifer's work. Once Siegfried declared Jennifer in default, there were three options under the performance bond: (1) Gulf could remedy the default, (2) Gulf, upon Siegfried's demand, could arrange for the performance of Jennifer's obligation, or (3) Siegfried, after reasonable notice, could arrange for the performance of Jennifer's obligation. Though not defined in the bond, reasonable notice is generally described as notice conveying the requisite information and permitting time for response. Cf. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (defining reasonable notice in the context of due process). Siegfried contends that its July 28, 1997 letter to Gulf and accompanying documents constituted reasonable notice that it was arranging for the performance of Jennifer's contractual duties. The first paragraph of the letter informed Gulf that Siegfried planned to submit a claim for payment under the bond. The second paragraph informed Gulf that Jennifer's "failure to perform has necessitated that the Obligee supplement the Principal's work resources to correct unacceptable work and to assist in completing the Principal's work so as to mitigate delays." J.A. 197. On August 5, 1997, Siegfried received a letter from COP, Gulf's investigator, acknowledging receipt of the notice of claim, and promising to investigate all claims against Jennifer's bond. Apparently, Siegfried then telephoned COP and explained that it needed help to

11

complete Jennifer's work on the Sleep Inn. Siegfried had no further communications with COP, and Gulf did not object to Siegfried arranging for the completion and correction of Jennifer's work.

We disagree with the district court that Siegfried's communications cannot be interpreted as providing Gulf with reasonable notice or giving Gulf an opportunity to hire a replacement for Jennifer. Virginia courts have not been overly strict in interpreting the notice requirements of construction bonds. See Southwood Builders, Inc. v. Peerless Ins. Co., 366 S.E.2d 104, 106-07 (Va. 1988) (stating that the principles of strict construction do not apply in favor of sureties for hire); see also American Surety Co. of New York v. Zoby, 130 S.E.2d 587 (Va. 1963). And the evidence presented -- viewed in a light most favorable to Siegfried -- indicates that Siegfried's July 28 letter conveyed the requisite information under the bond. Siegfried explained to Gulf that as a result of Jennifer's substandard workmanship and insufficient number of workers, Siegfried was augmenting Jennifer's workforce and thus arranging for the performance of Jennifer's contractual duties. Moreover, Siegfried presented evidence that during the telephone conversation with Gulf's investigator it asked for help in completing Jennifer's work. In light of this request for assistance and considering that the project was not completed until the middle of September, Gulf had time to respond and exercise its options under the bond.

Gulf attempts to buttress the district court's holding by pointing out that Siegfried had been supplementing Jennifer's workforce long before the July 28 letter. While this fact is relevant to the amount of damages claimed against Gulf, it has no bearing on whether notice was given. In sum, the evidence produced at trial, which we construe in a light most favorable to Siegfried, indicates that Gulf received reasonable notice that Siegfried was arranging for the performance of Jennifer's obligation.

III.

For the foregoing reasons, we conclude that the district court erred in awarding Gulf judgment as a matter of law. The judgment of the district court is reversed and this matter is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED

12